UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------x

STEVEN RUFFIN,                                          :

                           Plaintiff,          :          **COMPLAINT**

          - against -                        :          25-cv-2138

THE CITY OF NEW YORK, LOUIS            :
SCARCELLA, IVAN RIVERA, STEVEN                   Jury Trial Demanded
RUFFIN, JORGE GUZMAN, DAVID            :
CARBONE, FRANK DELOUISA,
ANTHONY BAKER, JOHN SALLEY, AND  :
MICHAEL TITUS,
                                     :
                       Defendants.

-----------------------------------------------------------x

      Plaintiff, STEVEN RUFFIN, by his attorneys, the LAW OFFICES OF JOEL B.

RUDIN, P.C., respectfully alleges, upon information and belief, as follows:

## NATURE OF THE ACTION

      1.     This is a civil action, pursuant to 42 U.S.C. §§ 1983 and 1988, New York

State law, and New York City Administrative Code § 8-803, seeking monetary damages

for Plaintiff Steven Ruffin for his wrongful prosecution, conviction, and 14-year

imprisonment for a murder he did not commit.

      2.     Prior to his arrest, Mr. Ruffin, a 17-year-old high school student, had never

been arrested.

      3.     Mr. Ruffin's conviction was overturned in 2024 following a decade-long

reinvestigation of his case by the Kings County District Attorney's Office's Conviction

Review Unit, the Legal Aid Society, and his own *pro bono* attorneys.

4.      The District Attorney's Office, in a public statement, acknowledged that "Mr. Ruffin was convicted for the actions of a different person whom he claimed to be the killer all along."

5.      The corrupt tactics used to convict Mr. Ruffin included causing an eyewitness to mistakenly identify him through blatantly suggestive identification procedures, coercing Mr. Ruffin into confessing to the homicide, suppressing evidence that would have eviscerated the credibility of the infamous detective, Louis Scarcella, who obtained that confession, and other misconduct.

6.      Such tactics occurred with impunity in the 1980s and 1990s at the New York City Police Department ("NYPD") and the Kings County District Attorney's Office ("KCDA").

7.      The toleration of such misconduct by City policymaking officials encouraged its repetition and led directly to the miscarriage of justice that occurred in this case, thus subjecting the Defendant City to liability under federal civil rights principles.

## JURISDICTION AND VENUE

8.      This action arises under 42 U.S.C. §§ 1983 and 1988, and the common law of the State of New York.

9.      This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343 and under the principles of pendent jurisdiction.

10.     Venue is proper under 28 U.S.C. § 1391.

11.     This action has been commenced within the applicable period for each claim.

12.     On April 15, 2024, Plaintiff served the City of New York timely notice of the present claims, in accordance with N.Y. Gen. Mun. Law. § 50–e.

13.     On September 17, 2024, a hearing was conducted by the City in accordance with N.Y. Gen. Mun. Law. § 50–h.

14.     Plaintiff has duly complied with all conditions precedent to the commencement of this action.

## THE PARTIES

15.     Plaintiff STEVEN RUFFIN, is a citizen and resident of the State of Georgia and the United States. He resides within the Northern District of Georgia.

16.     Defendant CITY OF NEW YORK ("City") is a municipal corporation of the State of New York and is a resident of the Eastern District of New York.

17.     Defendant LOUIS SCARCELLA, Shield Number 92, Tax ID 868997, was at all relevant times a detective employed by the New York City Police Department ("NYPD"), acting within the scope of his authority and under color of state law. He is named here in his individual and official capacities.

18.     Defendant IVAN RIVERA, Shield Number 5434, Tax ID 912690, was at all relevant times a detective employed by the NYPD, acting within the scope of his authority and under color of state law. He is named here in his individual and official capacities.

19.     Defendant STEVEN RUFFIN, Shield Number 28738, Tax ID 886425, was at all relevant times a police officer employed by the NYPD, acting within the scope of

his authority and under color of state law. He is named here in his individual and official capacities.

20.    Defendant JORGE GUZMAN, Shield Number 2114, Tax ID 879050, was at all relevant times a detective employed by the NYPD, acting within the scope of his authority and under color of state law. He is named here in his individual and official capacities.

21.    Defendant DAVID CARBONE, Shield Number 1685, Tax ID 883604, was at all relevant times a detective employed by the NYPD, acting within the scope of his authority and under color of state law. He is named here in his individual and official capacities.

22.    Defendant FRANK DELOUISA, Shield Number 933, Tax ID 877174, was at all relevant times a detective employed by the NYPD, acting within the scope of his authority and under color of state law. He is named here in his individual and official capacities.

23.    Defendant ANTHONY BAKER, Shield Number 638, Tax ID 883014, was at all relevant times a detective employed by the NYPD, acting within the scope of his authority and under color of state law. He is named here in his individual and official capacities.

24.    Defendant JOHN SALLEY, Shield Number 2821, Tax ID 874727, was at all relevant times a detective employed by the NYPD, acting within the scope of his authority and under color of state law. He is named here in his individual and official capacities.

25.     Defendant MICHAEL TITUS, Shield Number 4210, Tax ID 874819, was at all relevant times a detective employed by the NYPD, acting within the scope of his authority and under color of state law. He is named here in his individual and official capacities.

### ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

**I.     The homicide of James Deligny**

26.     On the evening of February 5, 1996, Plaintiff Steven Ruffin's sister, Diane Nevet Ruffin ("Nevet"), was robbed of her earrings outside her home at 1 Revere Place in Brooklyn, New York.

27.     Nevet was pregnant at the time.

28.     Her then-boyfriend, Johnne Glover, was the father.

29.     Plaintiff, Nevet, Glover, Plaintiff's and Nevet's cousin, Willie Jabar Alexander, their neighbor, Derrick Jones, and Jones' cousin, Jared White, attempted to pursue the robber.

30.     The group sought to catch up to an individual walking on the street, whom they suspected was the robber.

31.     This individual was named James Deligny.

32.     Walking with Mr. Deligny was his sister, Cindya Clayton.

33.     Plaintiff and Nevet lagged well behind the rest of the group, because Nevet was pregnant and couldn't move as fast as the others.

34.     Upon being confronted, in the vicinity of 11 Kingston Avenue in Brooklyn, Deligny motioned as though he had a gun.

35.    Johnne Glover then shot Deligny.

36.    The shooting occurred at approximately 9:10 p.m.

37.    Mr. Deligny died at the scene.

**II.    <u>Witnesses describe the perpetrator to police</u>**

38.    Defendant Rivera, a detective assigned to the NYPD's 79th Precinct, was

tasked with leading the investigation.

39.    Cindya Clayton was interviewed by Detective Stephen Chmil.

40.    Clayton stated that:

- As she and Deligny were walking down Kingston Avenue, six Black men followed them;

- Three of the men stood on the corner of Herkimer Street and Kingston Avenue;

- The other three men approached Clayton and Deligny;

- One of three men, the perpetrator of the shooting, grabbed Deligny by the coat;

- The perpetrator had a brown complexion and short hair, was 16 or 17 years old, was 5 feet 4 inches tall, and was shorter than Clayton;

- The perpetrator had on dark clothing and a hoody;

- Deligny tried to scare the men away by reaching into his coat as though he had a gun;

- The two other men jumped back;

- The perpetrator removed a gun from his right pants pocket and shot at Deligny three times;

- The first shot missed, but the second and third hit Deligny;

- The perpetrator then pointed the gun at Clayton;

6

▪    The perpetrator then ran away.

.

41.    Another eyewitness to the shooting, Cletus Barber, claimed to recognize the

shooter from the neighborhood, but did not say who it was.

### III.    Defendant-Detectives subject Plaintiff Ruffin to blatantly improper identification procedures

42.    On the purported basis of tips, of unknown reliability, Rivera and other

detectives conducted showup identification procedures with Ruffin as their subject.

43.    On February 12, 1996, Defendant Rivera told Clayton that she would be

driven to a house at the corner of Revere Place, where a suspect would be present.

44.    Defendants Carbone and DeLouisa then drove Clayton to that location,

which in fact was Ruffin's home.

45.    Defendant Rivera was in another, nearby car, directing a showup procedure

via radio transmissions to Carbone and DeLouisa.

46.    Defendants Baker and Guzman were in Rivera's car.

47.    Defendants Salley and Titus were in a third car.

48.    Clayton was told by Carbone and/or DeLouisa that a suspect would be

coming out of the house.

49.    At around 6 p.m., Ruffin emerged from his home along with Jared White.

50.    Ruffin was wearing a black coat over a white hoody, which was similar to

the clothing that Clayton had described.

51.    As if this wasn't suggestive enough, police also told Clayton that one of the

two men was the police suspect.

7

52.     Even so, Clayton failed to identify Ruffin.

53.     Detectives Carbone and DeLouisa then followed Ruffin and White, who were on foot, to a store.

54.     After Ruffin and White emerged from the store, Clayton saw Ruffin but still said she was not sure that Ruffin was the perpetrator.

55.     Carbone and DeLouisa's car followed Ruffin and White back to Ruffin's home.

56.     Defendants Rivera, Guzman, Baker, Salley, and Titus forcibly arrested Ruffin.

57.     Ruffin was struck repeatedly and his hood was removed.

58.     Clayton witnessed this.

59.     The time of Ruffin's arrest was approximately 6:45 p.m.

60.     Ruffin was transported to the 79th Precinct.

61.     At the 79th Precinct, Ruffin was placed in a lineup, which Clayton viewed.

62.     Ruffin was wearing clothing that Clayton had seen him wearing during the various on-the-street showups.

63.     This time, she indicated she recognized Ruffin.

64.     However, still evidently uncertain, Clayton asked to be shown each participant's teeth.

65.     Ruffin had a cracked tooth.

66.     This was a characteristic he shared with the actual perpetrator, Johnne Glover.

67.     Only upon seeing Ruffin's teeth did Clayton confirm her identification, indicating she recognized Ruffin by his cracked tooth.

## IV.  Defendants Scarcella and Rivera, with the help of Plaintiff's biological father Defendant Ruffin, coerce Plaintiff into falsely confessing

### A.     Scarcella and Rivera begin interrogating Ruffin

68.     Defendants Rivera and Scarcella commenced a relentless custodial interrogation of Ruffin.

69.     Ruffin was 17 years old at the time.

70.     After Scarcella and Rivera read *Miranda* warnings to Ruffin, he asked whether he needed a lawyer, but the detectives assured him he did not.

71.     Ruffin truthfully told Scarcella and Rivera the events of the evening, including that he and his sister were a half-block away from the site of the shooting when it occurred.

72.     Ruffin then signed a statement denying that he committed the shooting or possessed a gun.

73.     This statement, written out by Scarcella, began with the words, "I was there…"

74.     This was a catchphrase that Scarcella used to begin "confessions," several false, that he took from suspects (*see* ¶¶ 275–76, *infra*).

75.     Scarcella then left the room and spoke on the phone with Claimant Ruffin's sister, Nevet.

76.     Nevet confirmed that she was with Ruffin at the time of the shooting.

77.    Nonetheless, Scarcella returned to the room and accused Ruffin of lying.

78.    Scarcella told him, falsely, that his sister had denied being with him at the time of the shooting.

79.    Scarcella documented his false account of his conversation with Nevet in a DD-5 report.

80.    Ruffin continued to resist Scarcella's attempts to get him to admit something he had not done and signed a second written statement denying guilt.

81.    Appearing angry, Scarcella told Ruffin that if he did not admit he was the shooter, he would be imprisoned for 35 to 50 years.

82.    Ruffin continued to tell detectives that he wasn't the shooter.

83.    Scarcella left the room, and then Rivera took over.

84.    He accused Ruffin of lying and demanded that he stop doing so.

85.    Scarcella then returned to the room with Claimant's father, Defendant Steven Ruffin (hereafter referred to as "Defendant Ruffin").

**B.    Defendant Ruffin had been falsely led to believe his son was the perpetrator**

86.    Defendant Ruffin was a police officer assigned to the 79th Precinct.

87.    Plaintiff Ruffin had a distant and strained relationship with his father, who did not raise him and spent little time with him.

88.    Defendant Guzman had called Defendant Ruffin to inform him that his son had been arrested.

89.     Guzman, a detective, was a colleague of Defendant Ruffin's at the 79th Precinct.

90.     The Defendant-Detectives lied to Defendant Ruffin about the evidence they had against his son, falsely making it appear overwhelmingly that he was the shooter.

91.     He decided to assist the detectives in extracting a confession from his own son.

92.     Upon arriving at the 79th Precinct, Defendant Ruffin encountered Johnne Glover standing outside.

93.     Defendant Ruffin told Glover that he wanted to hurry up and make Plaintiff confess, so that he could get home.

94.     At the 79th Precinct, Defendant Ruffin spoke with his ex-wife and Plaintiff's mother, Harriet Chavis.

95.     Ms. Chavis instructed Defendant Ruffin to tell Plaintiff, who was 17 years old, not to say anything to the police.

96.     Defendant Ruffin responded that if he was allowed to see Plaintiff, he would see what he could do.

**C.    Detectives Scarcella and Rivera and Defendant Ruffin extract a false confession from Plaintiff**

97.     Contrary to what Defendant Ruffin promised Ms. Chavis, at no point after joining Scarcella and Rivera for Plaintiff's interrogation did he tell his son not to speak to the police.

98.     Plaintiff told Defendant Ruffin that he did not commit the shooting.

99.     However, Defendant Ruffin told his son that he unless he told the "truth" that he had committed the crime, he would spend his life imprisoned.

100.    Defendants Scarcella, Rivera, and Ruffin made clear to Plaintiff that they were not interested in hearing any explanation of what occurred or who the shooter was if it did not involve his admission of his own guilt.

101.    They indicated to Ruffin that, unless he confessed, the detectives would go after his pregnant sister, who had been with him at the time of the shooting, and that her child would be born in jail.

102.    However, they told Ruffin that, if he admitted the crime, they would ensure that he received leniency.

103.    In this vein, they suggested to him that if he admitted the shooting, they would try to paint it as self-defense.

104.    Giving in to the detectives' and his father's coercive tactics, and trusting that his police officer-father would not lie to him, Ruffin then provided a false story, confessing to shooting the victim as he appeared to be reaching for a weapon.

105.    Ruffin had been in custody for more than five hours by this point.

106.    Scarcella asked Ruffin where the gun used in the shooting was.

107.    Ruffin told Scarcella that he believed Glover had the gun.

108.    As a result of their coercive tactics, the police obtained a third written statement from Ruffin, this one falsely admitting he was the shooter.

109.    Defendants Ruffin, Scarcella and Rivera retrieved the gun from Glover.

110.    Although Glover's possession of the gun was obviously unlawful, they did not ask him any questions about how he came to possess it, nor did they arrest him for possessing it.

111.    Glover was not exhibited to Clayton in a lineup.

112.    Neither Ruffin nor Glover were exhibited to Cletus Barber, the eyewitness who claimed to recognize the shooter from the neighborhood (*see* ¶ 41, *supra*), in a lineup.

113.    Rivera told Ruffin that he needed to repeat on camera for the District Attorney what he had told the detectives in his last statement to them.

114.    Rivera told Ruffin to not waste their time by repeating his earlier story about not being the shooter.

115.    With Rivera present to ensure that Ruffin repeated his false confession, Ruffin then did so in the presence of an assistant district attorney.

116.    Ruffin's inculpatory statements contained obvious indicia of falsity, including but not limited to:

(a)    Ruffin incorrectly said that the gun was a "30 snub nose," whereas the gun used in the shooting was a .38 caliber.

(b)    Ruffin said that he told the deceased, "Hold on I want to make sure you['re] the person who robbed my sister," whereas Clayton gave an account to the contrary.

(c)    Ruffin said that he drew the gun from the left side, whereas Clayton had said the shooter removed a gun from his right pocket.

(d)    Ruffin made up that "John" and "Kay" were at the scene with him, and at one point during his videotaped statements had to be reminded by

Defendant Rivera that he'd said earlier that Derrick and Anthony were there.

117.    Separately, on the same day, Plaintiff told Defendant Ruffin his statement was false.

118.    He told Defendant Ruffin that Glover was the shooter.

119.    However, Defendant Ruffin did not report Plaintiff's recantation, or the accusation that Glover was the shooter, to the District Attorney.

**V.    Plaintiff is wrongfully prosecuted and convicted**

120.    On February 13, 1996, Defendant Rivera swore to the truthfulness of a Criminal Court complaint falsely accusing Ruffin of murder.

121.    At his Criminal Court arraignment on February 14, 1996, Ruffin was remanded without bail.

122.    He remained in custody for the next 14 ½ years.

123.    Clayton testified before a grand jury that she had identified Ruffin at a lineup.

124.    However, neither the detectives nor the prosecutor revealed to the grand jury that her "identification" followed several police-arranged viewings where she did not recognize Ruffin as the shooter. The grand jury thus was misled.

125.    Rivera further misled the grand jury by testifying to Ruffin's inculpatory statements without revealing the manner in which they had been coerced.

126.    The grand jury was never informed by anyone of these circumstances.

127.    On or about February 20, 1996, the grand jury voted an indictment charging Plaintiff with murder in the second degree, criminal possession of a weapon in the second degree, and criminal possession of a weapon in the third degree.

**VI.    Ruffin is convicted at trial based on Clayton's flawed identification and his coerced statements**

128.    Plaintiff's jury trial commenced on November 6, 1996, in the Supreme Court, Kings County.

129.    During the trial, Clayton (but no other witness) identified Plaintiff as the perpetrator.

130.    Plaintiff's inculpatory statements were introduced against him.

131.    Plaintiff, Derrick Jones, and Willie Jabar Alexander testified that Glover was the shooter.

132.    Plaintiff, Nevet, Jones, and Alexander testified that Plaintiff and Nevet were standing a good distance away from the scene of the shooting.

133.    Plaintiff testified concerning the coercion of his statements by Defendants Scarcella, Rivera, and P.O. Ruffin.

134.    Plaintiff called Johnne Glover to testify.

135.    Glover, outside the presence of the jury, invoked the Fifth Amendment as to questions concerning his teeth and his activities at the time of the shooting.

136.    In her testimony, Nevet denied telling Scarcella that she was not with Plaintiff at the time of the shooting.

15

137.    The prosecution called Scarcella as a rebuttal witness to testify that Nevet had told him she wasn't with Plaintiff.

138.    This testimony was false.

139.    On November 21, 1996, the jury acquitted Ruffin of murder in the second degree, but convicted him of manslaughter in the first degree and criminal possession of a weapon in the second degree.

140.    On December 11, 1996, Ruffin was sentenced to consecutive terms of 12 ½ to 25 years of incarceration for manslaughter, and 7 ½ to 15 years of incarceration for criminal possession of a weapon.

141.    On October 4, 1999, the Appellate Division, Second Department, modified the sentence to have the terms run concurrently.

142.    Ruffin remained in custody until he was released on parole on June 24, 2010.

143.    Ruffin remained on parole until August 13, 2013.

**VII.    The KCDA concludes that Ruffin is innocent and moves to vacate his conviction**

144.    After Ruffin had finished serving his sentence, the KCDA's Conviction Review Unit ("CRU") began a reinvestigation that took 10 years.

145.    The CRU issued a report on Ruffin's case on January 18, 2024.

146.    It concluded, among other things, that the NYPD's and KCDA's investigations were inadequate, because Johnne Glover was never investigated.

147.    The CRU also noted that "Clayton's in-court identification of [Ruffin] was unreliable."

148.    It also concluded that Claimant's confession was unreliable.

149.    In a press release accompanying the release of the report, District Attorney Gonzalez was quoted as saying, "Mr. Ruffin was convicted for the actions of a different person whom he claimed to be the killer all along."

150.    The same day, the KCDA moved to vacate the conviction and dismiss the underlying indictment.

151.    The motion was granted that day.

**FIRST CAUSE OF ACTION**
**Coercion Under 42 U.S.C. § 1983**
**Violation of the Fifth, Sixth, and Fourteenth Amendments**
**All Individual Defendants**

152.    Plaintiff repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

153.    The Individual Defendants, individually and in concert, used psychological coercion to obtain involuntary statements from Ruffin.

154.    Plaintiff was primed for this psychological coercion by the beating he endured upon his arrest, at the hands of Defendants Rivera, Guzman, Baker, Titus, and/or Salley.

155.    Plaintiff's coerced statements were introduced in the grand jury as evidence supporting charges against Ruffin and resulted in his indictment and subsequent prosecution.

156.    These statements were introduced against Ruffin at trial and resulted in his conviction.

157.    The Individual Defendants are directly liable for their violation of Mr. Ruffin's constitutional rights pursuant to 42 U.S.C. § 1983 and to the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

158.    Alternatively, the Individual Defendants each had an affirmative duty to Mr. Ruffin to protect his above-mentioned constitutional rights from infringement by other government officials.

159.    The Individual Defendants each knew that Plaintiff's constitutional rights would be violated if the Individuals Defendants' NYPD colleagues coerced statements from Plaintiff and those statements were used at a criminal proceeding.

160.    The Individual Defendants each had reasonable opportunities to intervene to prevent such infringement of Plaintiff's constitutional rights.

161.    Nevertheless, the Individual Defendants each deliberately, willfully, recklessly, and/or with deliberate indifference to the truth failed to take reasonable steps to intervene.

162.    As a result of the Individual Defendants' failure to intervene, Plaintiff was coerced into making statements, and those statements were used in the grand jury to indict him and at trial to convict him.

163.    In failing to intervene, the Individual Defendants each caused the violation of Plaintiff's right not to have a coerced statement used against him in the grand jury and

at a criminal trial under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

164.   In failing to intervene, the Individual Defendants caused Plaintiff's resulting injuries.

165.   By virtue of the foregoing, under 42 U.S.C. § 1983, the Individual Defendants are liable to Plaintiff for all his consequential damages, including but not limited to his wrongful prosecution, conviction, and subsequent imprisonment and parole restrictions, and for punitive damages.

**SECOND CAUSE OF ACTION**
**Evidence Fabrication Under 42 U.S.C. § 1983**
**Violation of the Fourth, Fifth, Sixth, and Fourteenth Amendments**
**All Individual Defendants**

166.   Plaintiff repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

167.   The Individual Defendants, individually and in concert, knowingly, intentionally, willfully, recklessly, and/or with deliberate indifference to the truth, caused the manufacture or fabrication of false or patently unreliable statements and identifications, and false or materially misleading documentary evidence, implicating Mr. Ruffin in the crime.

168.   The evidence they fabricated or manufactured includes but is not limited to: (i) Clayton's false identification of Plaintiff; (ii) Plaintiff's false oral, written, and videotaped statements implicating himself in the crime; (iii) Detective Rivera's DD-5

report documenting Plaintiff's statements; and (iv) Detective Scarcella's DD-5 report falsely stating that Nevet said she was not with Plaintiff at the scene of the shooting.

169.    The Individual Defendants manufactured false evidence for the purpose of causing criminal charges to be approved, and criminal proceedings to be initiated and continued, against Mr. Ruffin.

170.    They forwarded or caused the forwarding of such false or manufactured material to prosecutors for use against Mr. Ruffin.

171.    They knew that the evidence they forwarded to prosecutors would be likely to influence a jury's decision at trial.

172.    As a result of the Individual Defendants' aforementioned conduct, prosecutors initiated and continued a prosecution of Mr. Ruffin and he was deprived of his liberty.

173.    The above misconduct by the Individual Defendants was outrageous and shocking to the conscience.

174.    The Individual Defendants' conduct violated Mr. Ruffin's right to be free from unreasonable seizure as guaranteed by the Fourth and Fourteenth Amendments to the United States Constitution, his Fifth and Fourteenth Amendment rights to procedural and substantive due process, and his Sixth and Fourteenth Amendment right to a fair trial.

175.    Alternatively, the Individual Defendants each had an affirmative duty to Mr. Ruffin to protect his above-mentioned constitutional rights from infringement by other government officials.

176.    Each of the Individual Defendants knew that Mr. Ruffin's constitutional rights would be violated if the conduct of the other government officials caused false, manufactured, fabricated or obviously unreliable evidence to be used against Mr. Ruffin and to deprive him of his liberty.

177.    Each of the Individual Defendants had reasonable opportunities to intervene to prevent such infringement of Mr. Ruffin's constitutional rights.

178.    Nevertheless, each of the Individual Defendants deliberately, willfully, recklessly, and/or with deliberate indifference to the truth failed to take reasonable steps to intervene.

179.    As a result of the Individual Defendants' failure to intervene, evidence was fabricated or manufactured against Plaintiff that would be likely to influence the decision at trial of a jury, was forwarded to prosecutors, and caused him to suffer the deprivation of his liberty.

180.    In failing to intervene, the Individual Defendants each caused the violation of Plaintiff's right to be free from unreasonable seizure as guaranteed by the Fourth and Fourteenth Amendments to the United States Constitution, his Fifth and Fourteenth Amendment rights to procedural and substantive due process, and his Sixth and Fourteenth Amendment right to a fair trial.

181.    In failing to intervene, the Individual Defendants substantially caused Plaintiff's resulting injuries.

182.    By virtue of the foregoing, under 42 U.S.C. § 1983, the Individual Defendants are liable to Plaintiff for all his consequential damages, including but not

limited to his wrongful prosecution, conviction, and subsequent imprisonment and parole restrictions, and for punitive damages.

**THIRD CAUSE OF ACTION**
**Malicious Prosecution Under New York Law**
**All Defendants**

183.    Plaintiff repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

184.    The Individual Defendants, individually and in concert, acted knowingly, willfully, intentionally, and with actual malice to initiate and/or to continue criminal proceedings against Mr. Ruffin.

185.    They did so without probable cause.

186.    The proceedings terminated in Mr. Ruffin's favor.

187.    By virtue of the foregoing, the Individual Defendants are liable to Plaintiff for all his consequential damages, including but not limited to his wrongful prosecution, conviction, and subsequent imprisonment and parole restrictions, and for punitive damages.

188.    Defendant City of New York is similarly liable under the principle of *respondeat superior*.

**FOURTH CAUSE OF ACTION**
**Malicious Prosecution Under 42 U.S.C. § 1983**
**Violation of the Fourth, Fifth, and Fourteenth Amendments**
**All Individual Defendants**

189.    Plaintiff repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

190.   The Individual Defendants, by their foregoing conduct in initiating and continuing Plaintiff's criminal prosecution without probable cause, caused Plaintiff to be deprived of his liberty.

191.   In doing so, they are liable to him for their violation of his federal constitutional right to be free of unlawful detention and malicious prosecution pursuant to 42 U.S.C. § 1983 and to the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution.

192.   Alternatively, the Individual Defendants each had an affirmative duty to Mr. Ruffin to protect his above-mentioned constitutional rights from infringement by other government officials.

193.   The Individual Defendants each knew that Plaintiff's constitutional rights would be violated if the Individuals Defendants' NYPD colleagues were to cause Plaintiff to be prosecuted without probable cause.

194.   The Individual Defendants each had reasonable opportunities to intervene to prevent such infringement of Plaintiff's constitutional rights.

195.   Nevertheless, the Individual Defendants each deliberately, willfully, recklessly, maliciously, and/or with deliberate indifference to the truth failed to take reasonable steps to intervene.

196.   As a result of the Individual Defendants' failure to intervene, Plaintiff was prosecuted without probable cause and deprived of his liberty.

197.    In failing to intervene, the Individual Defendants each caused the violation of Plaintiff's rights under the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution.

198.    In failing to intervene, the Individual Defendants substantially caused Plaintiff's resulting injuries.

199.    By virtue of the foregoing, under 42 U.S.C. § 1983, the Individual Defendants are liable to Plaintiff for all his consequential damages, including but not limited to his wrongful prosecution, conviction, and subsequent imprisonment and parole restrictions, and for punitive damages.

## FIFTH CAUSE OF ACTION
### Violations of Rights Under New York City Administrative Code § 8-802
### All Defendants

200.    Plaintiff repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

201.    Pursuant to § 8-803 of the New York City Administrative Code, the Individual Defendants and their employer, the City of New York, are liable for their aforementioned violations of Mr. Ruffin's rights, for his actual damages, for punitive damages, and for his attorneys' fees, costs and expenses.

## SIXTH CAUSE OF ACTION
### *Monell* Liability Under 42 U.S.C. § 1983 Based on the Violation by NYPD Detectives of Plaintiff's Right to Due Process and a Fair Trial Under the Fourth, Fifth, Sixth, and Fourteenth Amendments.
### Defendant City of New York.

202.    Plaintiff repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

203.    The foregoing violations of Mr. Ruffin's federal constitutional rights and injuries were directly, foreseeably, proximately, and substantially caused by conduct, chargeable to Defendant City of New York, amounting to unconstitutional policies, practices, and/or customs with respect to the rights of persons, including Mr. Ruffin, who are investigated by NYPD officers and subsequently prosecuted for alleged criminal offenses.

204.    Under the principles of municipal liability for federal civil rights violations, the City's Police Commissioner and/or his authorized delegates, during all times relevant to this Complaint, had final responsibility as a municipal policymaker for training, instructing, supervising, and disciplining police officers and other employees of the NYPD with respect to the investigation and prosecution of criminal matters, including but not limited to, constitutional obligations:

a.      prohibiting the use of physical and psychological coercion during the questioning or interrogation of suspects and witnesses;

b.      to refrain from manufacturing, or causing the manufacturing, of false or unreliable identification evidence, false or unreliable confessions, and false or materially misleading or incomplete reports, for use against criminal suspects and defendants in criminal prosecutions and trials;

c.      not to give false testimony against a criminal suspect; and

d.      not to initiate a prosecution without probable cause.

205.    In his role as policymaker, the Police Commissioner and/or his authorized delegates maintained a policy, custom, or practice of violations by NYPD employees of the above-enumerated constitutional obligations, or were deliberately indifferent to such

violations by NYPD employees, and to the obvious need to train, supervise, and discipline NYPD employees with respect to these obligations.

206.    Before Plaintiff's arrest and interrogation, policymaking officials at the NYPD knowingly failed to implement adequate policies, procedures, regulations, practices, customs, training, supervision, or discipline concerning the above-enumerated constitutional obligations.

207.    During all periods relevant to this lawsuit, the Kings County District Attorney was the chief law enforcement officer for Kings County and personally and/or through his authorized delegates had final authority, and constituted a City policymaker, with respect to the use of evidence gathered by NYPD officers and detectives during criminal proceedings.

208.    The Kings County District Attorney, and/or his authorized delegates, had final managerial responsibility for training, instructing, supervising, and disciplining ADAs and other employees in his office regarding their conduct in connection with the initiation and prosecution of criminal matters.

209.    The Kings County District Attorney, personally and/or through his authorized delegates, at all relevant times had final authority to promulgate and implement administrative and managerial policies and procedures, including policies and procedures as to personnel hiring, training, supervision, and discipline, with respect to his Office's performance of its duties.

210.    In his role as policymaker for the City, the Kings County District Attorney and/or his authorized delegates maintained a policy, custom, or practice of deliberate

indifference to violations by NYPD officers and detectives of their above-enumerated constitutional obligations; to the risk that such violations would and did produce false or unreliable evidence, testimony, and convictions; and to the risk of future such violations by NYPD employees.

211.    The aforesaid deliberate or *de facto* policies, procedures, regulations, practices and/or customs (including the failure to properly instruct, train, supervise and/or discipline employees with regard thereto) were implemented or tolerated by policymaking officials for the Defendant City of New York, including but not limited to, the NYPD Commissioner and the Kings County District Attorney, who knew (or should have known):

    a.    to a moral certainty that such policies, procedures, regulations, practices, and/or customs concern issues that regularly arise in the investigation and prosecution of criminal cases;

    b.    that such issues either present police employees with difficult choices of the sort that instruction, training, and/or supervision will make less difficult, or that the need for further instruction, training, supervision, and/or discipline was demonstrated by a history of police employees mishandling such situations as well as the incentives that police employees have to make the wrong choice; and

    c.    that the wrong choice by such employees concerning such issues will frequently cause the deprivation of the constitutional rights of criminal suspects or defendants and cause them constitutional injury.

212.    The aforementioned policymaking officials had the knowledge and the notice alleged in the preceding paragraphs based upon, among other circumstances:

    a.    credible allegations, many substantiated by judicial decisions finding, that NYPD detectives had manufactured false or unreliable identification and other evidence through improper suggestion, promises, or coercion, and/or knowingly given false or misleading testimony;

b.  civil lawsuits, some of which resulted in substantial civil settlements, credibly alleging that police had falsified or exaggerated evidence, and/or conducted searches or made arrests without probable cause;

c.  numerous decisions of the United States Supreme Court, the United States Court of Appeals for the Second Circuit, Federal District Courts, the New York Court of Appeals, and the New York Appellate Division, discussing the difficult issues that regularly arise under the probable cause requirement of the Fourth Amendment;

d.  judicial decisions putting the NYPD on notice that the City could be held liable for its failure to adequately train police officers and investigators regarding their obligations to provide truthful testimony;

e.  formal reports of the N.Y.C. Comptroller's Office and the Bar Association of the City of New York criticizing the NYPD and the N.Y.C. Law Department for failing to follow up substantial civil settlements for police misconduct with disciplinary or other remedial action;

f.  the Mollen Commission Report, dated July 7, 1994, following a two-year investigation and a year of hearings, finding a "culture of corruption" in the NYPD, pervasive misconduct by NYPD officers and detectives including the fabrication of evidence and testimony, and tolerance of this culture and misconduct by the Department's leaders; and

g.  the inherent obviousness of the need to train, supervise, and discipline police officers in such obligations to counteract the pressure on officers and their powerful incentives to close cases and to obtain arrests and convictions.

213.  Many of the aforementioned illegal practices, their toleration by NYPD and KCDA policymakers, and the culture of corruption that their indifference created, were documented, before the prosecution and conviction of Mr. Ruffin, in the aforementioned Mollen Commission Report, formally known as the Report of the Commission to Investigate Allegations of Police Corruption and the Anti-Corruption Procedures of the NYC Police Department.

214.    The Mollen Commission was formed in 1992 after widespread reports of police corruption, including, among other things, the fabricating of evidence in criminal investigations.

215.    The Commission conducted an investigation and held highly publicized hearings over two years, leading to the issuance of its final report on July 7, 1994, less than two years prior to Mr. Ruffin's arrest.

216.    The Mollen Commission found that

> [o]fficers . . . commit falsification to serve what they perceive to be "legitimate" law enforcement ends—and for ends that many honest and corrupt officers alike stubbornly defend as correct. In their view, regardless of the legality of the arrest, the defendant is in fact guilty and ought to be arrested. Officers reported a litany of manufactured tales. . . .
>
> Frustrated by what they perceive to be unrealistic rules of law and by their own inability to stem the crime in their precincts through legal means, officers take the law into their own hands. And police falsification is the result.

Report at 38.

217.    The report noted: "Several officers . . . told us that the practice of police falsification . . . is so common in certain precincts that it has spawned its own word: 'testilying.'" *Id.* at 36.

218.    In one NYPD unit, the Commission found that "the unit's commanding officer not only tolerated, but encouraged, th[e] unlawful practice" of "falsif[ying] documents" and "committ[ing] testimonial perjury." *Id.* at 39.

219.    The Commission concluded that there existed

> … a deep-rooted perception among many officers of all ranks within the Department that nothing is really wrong with compromising facts to fight crime in the real world. Simply put, despite the devastating consequences of police falsifications, there is a persistent belief among many officers that it is necessary and justified, even if unlawful. . . . This attitude is so entrenched, especially in high-crime precincts, that when investigators confronted one recently arrested officer with evidence of perjury, he asked in disbelief, "What's wrong with that? They're guilty."

*Id.* at 41.

220.    The Commission also noted that

> the Department's top commanders must share the blame. . . . We are not aware of a single instance in which a supervisor or commander has been sanctioned for permitting perjury or falsification on their watch.

> Nor do we know of a single, self-initiated Internal Affairs Division investigation into patterns of police perjury and falsification. . . . Internal Affairs over the last decade had no record of the number of falsification allegations brought against officers throughout the Department or in a particular precinct or command. There is no evidence that anyone in the Department's chain of command had focused on eliminating this practice, including past Police Commissioners and Internal Affairs chiefs, *who apparently turned a blind eye to unlawful practices that were purportedly committed to fight crime and increase arrest statistics*.

*Id.* at 41-42 (emphasis added).

221.    Consistent with the findings of the Mollen Commission, NYPD and KCDA policymakers were aware, prior to Mr. Ruffin's prosecution, that many detectives habitually violated proper police protocol regarding the investigation of homicides and other felonies, including through the use of unduly suggestive identification procedures, the use of coercive or unduly suggestive interrogation techniques, and the preparation of false or misleading documentation.

30

222.    However, NYPD and KCDA policymakers did little or nothing to prevent such misconduct, resulting in countless wrongful arrests, prosecutions, and convictions that were directly attributable to such policymakers' deliberate indifference.

223.    At the time of Plaintiff's arrest and prosecution, NYPD and KCDA policymaking officials also knew about, but were deliberately indifferent to, past misconduct by Defendant Scarcella and his partner, Stephen Chmil.

224.    During much of the period when Scarcella and Chmil were active detectives, they were partners.

225.    Scarcella and Chmil had a reputation for securing confessions in such a high percentage of the cases they were involved in that their conduct was inherently suspect.

226.    On November 20, 1996, while Plaintiff Ruffin was on trial, a columnist for the *New York Daily News* wrote of Scarcella: "He is one of the best at getting even the worst villains to talk. . . . In big cases, they bring in Scarcella."

227.    A Kings County ADA described Scarcella's reputation around the time of Ruffin's trial in the following terms: "A lot of other detectives, a lot of colleagues of his, would call him, so to speak, as a kind of closer. In general, that was his specialty, getting people to talk."

228.    Chmil stated: "We had an unbelievable reputation for getting things done . . . . I'm not saying we didn't make mistakes."

229.    Scarcella's reputation for getting confessions was so widely known that at the March 1997 trial of a defendant named Jabbar Washington, Washington's attorney

31

asked Scarcella on cross-examination whether Scarcella agreed that confessions were his "specialty" and that he "g[o]t confessions in almost every single case [he] work[ed] on."

230.    Scarcella agreed, "I do get statements in most of my cases, yes."

231.    Scarcella and Chmil carried official NYPD business cards that they had amended to include the legend, "adventurers, marathoners, regular guys and mountain climbers."

232.    In numerous court proceedings at which representatives of the KCDA were present, allegations of misconduct by Scarcella and Chmil were put on the record.

233.    Nevertheless, they were never seriously investigated by the NYPD or the KCDA, which continued to use their suspect testimony and evidence with deliberate indifference to its accuracy and reliability and to the false convictions that it produced.

234.    In 1988, in the murder prosecution of James Jenkins, Brooklyn Supreme Court Justice Francis X. Egitto, following a hearing, issued a suppression order and decision.

235.    He found that the "pretrial identification procedures employed by [Scarcella] were unduly suggestive and prejudicial to defendant."

236.    The decision detailed how Scarcella, in violation of police practice and constitutional requirements, had shown a single photo of Jenkins to two witnesses instead of a photo array.

237.    It also detailed how, upon Jenkins's arrest, Scarcella had brought five witnesses to the precinct and conducted the following improper identification procedure:

The witnesses were not separated prior to viewing defendant. Indeed, they were individually and collectively told by Detective Scarcella that "we arrested the man we believe was responsible for the death of the deceased; I would like you to take a look at him." After each witness individually viewed the defendant through a two-way mirror, that witness was returned to the room where his fellow witnesses waited. No effort was made to keep the witnesses from discussing their viewing of defendant who was observed, alone, in a room.

238.    The court concluded:

The practices here utilized represent *a classic illustration of what not to do in conducting pretrial identification procedures*. It was unnecessary to display to the witnesses a single photo; no exigent circumstances justified a showup; and no argument can be advanced to support Detective Scarcella's telling the witnesses that the police had "arrested the man we believe was responsible for the death of the deceased." Based upon this *abysmal showing, and the Police's patent disregard for accepted identification procedures*, the court is left no choice but to exclude from trial all mention of such practices [emphases added].

239.    Additional instances of gross misconduct by Scarcella and Chmil were made public during the high-profile prosecution of David Ranta.

240.    In 1990, Ranta was charged with murder in the shooting death of a beloved Orthodox rabbi earlier that year.

241.    At a pretrial hearing, Scarcella testified that several months after the shooting, he spoke to a man named Alan Bloom, who had been arrested near the shooting location.

242.    Bloom was facing numerous robbery charges and many years in prison and was incarcerated at Rikers Island.

243.    Scarcella testified that Bloom had implicated men by the names of David and Steve but did not give last names.

244.    Scarcella testified that he then just happened to locate photos of David Ranta and Steve Sicar, placed them in a photo array or photo arrays, and showed them to Bloom, who identified both men as having participated in the shooting.

245.    At the hearing, Justice Egitto expressed his incredulity:

> I'm still interested when a person gets arrested, when we have a police officer who tells us the name Steve comes up and he goes ahead to the Catch Unit and picks out a picture of Ranta and Steve when nobody told him Steve's last name. I don't know if he's a medium of some kind. He also picked out the name of Ranta before anyone told him Ranta's last name. From what I gather he heard the name David. Lo[] and behold they are the right people.
>
> It stretches the credulity of the court in how these pictures are obtained.

246.    Scarcella also admitted, when confronted by defense counsel, that he and Chmil repeatedly had removed Bloom from Rikers Island pursuant to take-out orders signed by the D.A.'s Office and taken Bloom to a pizzeria and to Bloom's mother's house.

247.    The take-out orders authorized the detectives only to take Bloom to the D.A.'s Office for questioning.

248.    These violations of court orders and improprieties with prosecution witnesses had been known to the trial prosecutors, but were not disclosed to the defense, which found out about them through independent investigation.

249.    When challenged on cross-examination about this conduct, Scarcella testified, "I do what I want to do with my prisoners."

250.    Justice Egitto told Scarcella, "He's not your prisoner."

251.    At Ranta's trial, Chmil also was confronted about the take-out orders.

252.    Chmil testified that he and Scarcella had let Bloom, an incarcerated Rikers Island inmate, visit a friend, *outside of their presence*, at an address where they knew Bloom had previously gone to smoke *crack cocaine*.

253.    Chmil admitted that by taking Bloom for these visits, he and Scarcella were violating court orders.

254.    Chmil testified that he had not recorded the dates when he took Bloom for these visits even though, he agreed, it was part of his job to record such information in a DD-5.

255.    Chmil testified that he and Scarcella had also removed Demetri Drikman, another informant in the case, from jail and taken him out for lunch on multiple occasions.

256.    As Scarcella himself testified, ADAs Barry Schreiber and Suzanne Mondo *knew* that Scarcella and Chmil were taking Bloom and Drikman to places other than the D.A.'s Office, in repeated and flagrant violation of the court's take-out orders.

257.    At Ranta's trial, Scarcella also testified that Ranta had confessed to him during a discussion at Central Booking—a confession that Ranta disputed and that was fabricated.

258. Scarcella testified that, at the time, only one other officer was in Central Booking, but that officer just so happened to be in a corner where he could not hear the conversation between Scarcella and Ranta.

259. Scarcella testified that, during this conversation, Ranta gave Scarcella a confession that began with the exact same words he later wrote out for Plaintiff Ruffin: "I was there."

260. Before summations, Justice Egitto admonished Scarcella and Chmil at length, on the record, on several matters.

261. First, Justice Egitto commented on an audio recording that had been made during a critical lineup (and which prosecutors initially had withheld), which contained evidence that Scarcella and/or Chmil had used improper, suggestive methods to obtain identifications.

262. Justice Egitto stated:

> The more I hear this the more I am disillusioned with the work of the detectives.
>
> Here a young man of 14, 15 years of age says specifically I *think* it is number three. The cop, probably Scarcella or Chmil, says, okay, number three. From there on in the kid goes along with the number three . . . .
>
> He said, I *think* it is number three, which is not identifying any one [emphasis added].

263. With respect to Scarcella's testimony about Ranta's alleged confession, Justice Egitto said:

> [O]ne of [Scarcella's] statements that he took that written statement in Central Booking and there was no nobody in Central Booking but

him and a uniform officer in the corner is ludicrous. In all my experience Central Booking is a madhouse. You are never alone in Central Booking. No one is ever alone in Central Booking.

264. With respect to Scarcella's and Chmil's abuse of the take-out orders, Justice Egitto said:

> I don't like the detectives to take it upon themselves to be judge and jury in the case. I don't like a detective pulling the stunts that these two detectives did with a witness who happens to have five open robbery one cases.

265. Justice Egitto made the following additional remarks about Scarcella's and Chmil's conduct during the Ranta investigation:

> [T]hose two gentleman should be spoken to by your office [i.e., the D.A.'s Office]. I think what they have done in this case, in my opinion, is decide that Mr. Ranta was the person, the guilty party, and then they went out of their way to make sure it tied up neatly in a package.
>
> . . . .
>
> [T]hey decide the case and that is the reason why a lot of our cases are being blown out when the People only have the police officers to rely upon for their statements, such as narcotics cases and gun cases. The detectives have to be taught here in New York State, unlike a lot of other places, we have a constitution. And they have to live up to it. . . . I think it is ridiculous the way cops take it upon themselves to be judge, jury, and partial executioner.
>
> . . . .
>
> I tell you this. In my opinion throughout this case the two detectives did all they could to tie it up in a neat package. . . . I don't think what they did and the manner in which they did it was, shall we say, absolutely fair.

266. At his sentencing, in June 1991, Ranta alleged that Scarcella and Chmil were "two very corrupt cops" and had framed him.

267.    Despite Justice Egitto's comments, neither the NYPD nor the KCDA conducted any investigation of the conduct of Scarcella and Chmil and took no meaningful disciplinary action against them.

268.    At a post-conviction hearing on Ranta's 440 motion in 1995, the year before Plaintiff Ruffin's arrest and prosecution, Theresa Astin testified that her husband, Joseph Astin, who was by then deceased, had admitted to shooting Rabbi Werzberger.

269.    Testifying at the hearing, Scarcella acknowledged that he had taken substantial steps to investigate Joseph Astin but, once Astin died in a car accident in April 1990, had stopped investigating him.

270.    Scarcella admitted that he had not documented most of the steps he had taken to investigate Joseph Astin even though the information pointing to an alternative suspect obviously was *Brady* material.

271.    In 2013, then-District Attorney Charles Hynes, under public pressure, finally moved to vacate Ranta's conviction.

272.    Hynes did so largely based upon evidence of innocence and corruption of the investigation and prosecution which had been known to the KCDA since Ranta's trial or at the latest by the time of the 1995 post-judgment hearing.

273.    Hynes's delay in recognizing what the police and D.A.'s Office had done to Mr. Ranta caused him to spend more than 20 years in prison for a crime he did not commit.

274.    The Jenkins and Ranta cases were not the only instances of misconduct by Scarcella that were known to the KCDA before Plaintiff Ruffin's arrest and trial.

38

275.    The KCDA knew, or should have known, that, in numerous cases, Scarcella obtained statements that were suspiciously similar to each other and, together with Scarcella's reputation, demonstrated a probability of fabrication or coercion.

276.    These cases included, but were not limited to, the following:

   a.    In 1988, Scarcella claimed to obtain a confession from Louis Holmes (a.k.a. Shabaka Shakur) that began, "Man, you know what happened[,] you have it all." At trial, Scarcella testified that Holmes had said, "Man, you know the story. You know how it is."

   b.    In 1990, Scarcella claimed to obtain the confession from Ranta that began, "I was there."

   c.    In 1994, Scarcella and Chmil claimed to have obtain a confession from Hector Lopez that contained the words, "You guys got it right."

   d.    In 1995, Scarcella and Chmil claimed to obtain a confession from Thomas Malik in which Malik said, "okay, man. I was there."

   e.    In 1996, Scarcella claimed to obtain a confession from Jabbar Washington, that began with the words, "You got it right, I was there."

277.    A Brooklyn Supreme Court Justice later overturned Holmes's conviction after finding that Holmes's alleged confession had been "fabricated" by Scarcella.

278.    Washington's conviction was later overturned on the motion of the KCDA, after a reinvestigation by its CRU determined that Washington had not received a fair trial and useful information had been withheld from the defense.

279.    There were numerous other instances of apparent misconduct in obtaining confessions that provided notice to the NYPD and the KCDA that Scarcella was corrupt.

280.    In or about 1992, Sharon Valdez, after testifying against murder defendant Ronald Pondexter, told Pondexter's lawyer that Scarcella had coerced her into falsely implicating Pondexter by threatening to cause her to lose custody of her baby.

281.    Rather than investigate these allegations, the D.A.'s Office threatened to charge Valdez with perjury if she retook the stand and recanted her identification of Pondexter.

282.    When Valdez retook the stand, she then invoked the Fifth Amendment rather than recant her identification.

283.    In 1996, the Court of Appeals vacated Pondexter's conviction.

284.    Pondexter was acquitted on retrial.

285.    In 1993, Jewel Smith said in a sworn statement that she had testified against Derrick Hamilton at his murder trial only after Scarcella secretly threatened to jail her and cause her children to be taken away if she didn't inculpate Hamilton.

286.    Hamilton's conviction was later voluntarily vacated by the CRU for this and other misconduct by Scarcella.

287.    In her deposition in subsequent civil litigation, Smith testified that Defendant Frank DeLouisa and Defendant Scarcella together coerced her into making false statements inculpating Hamilton.

288.    At the September 1995 murder and arson trial of Hector Lopez, just months prior to Plaintiff Ruffin's arrest, defense counsel credibly argued that Scarcella had fabricated Lopez's confession.

289.    Before Ruffin's conviction, it was also known or should have been known to policymakers for the NYPD and the D.A.'s Office that in six different homicide prosecutions, Scarcella had used the false and unbelievable testimony of a single witness, Teresa Gomez, who was addicted to crack and engaged in prostitution, that she just happened to have witnessed six murders.

290.    Using Gomez's statements and testimony, Scarcella made himself a hero in closing at least two of these six homicide cases.

291.    Of course, it might have helped that Scarcella regularly gave Gomez money and food when he needed her to help him "solve" cases.

292.    Gomez testified that she had witnessed, among other homicides, the September 1985 killing of Ronnie Durant, the December 1986 killing of Bruce Siblings, and the January 1987 killing of Donald Manboardes.

293.    Gomez claimed to have seen Robert Hill shoot both Siblings and Manboardes, each on a separate occasion.

294.    Gomez claimed to have seen Alvena Jennette and Darryl Austin shoot Ronnie Durant.

295.    The first of these three cases that came to trial involved the killing of Siblings.

296.    Gomez testified in that trial in 1988.

297.    She testified that she had been hiding in the closet of a crack den and, looking through a keyhole in the closet door, witnessed Hill shoot Siblings.

298.    A defense investigator testified that the closet door had no keyhole.

41

299.    Hill was acquitted in that case.

300.    Based upon this trial, the D.A.'s Office knew that Gomez was an untruthful and unreliable witness.

301.    Nevertheless, when Scarcella presented Gomez as an eyewitness in the killings of Manboardes and Durant, the D.A.'s Office eagerly used her again.

302.    At this trial, in which Robert Hill again was a defendant, Gomez admitted she had lied at the previous trial.

303.    In addition, her testimony was contradicted by the forensic evidence.

304.    Nevertheless, Hill was convicted of the killing of Manboardes.

305.    The CRU later vacated this conviction.

306.    Gomez, still in 1988, testified that she had witnessed Jennette and Austin shoot Durant.

307.    Jennette and Austin were convicted of Durant's murder.

308.    The CRU later vacated these convictions as well.

309.    Another of the homicide cases in which Scarcella secured Gomez's testimony was dismissed during trial after Gomez failed to appear for her cross-examination.

310.    The prosecutor who conducted Hill's two trials and used Hill's testimony knew that, as he later admitted, Gomez was "ravaged from head to toe by the scourge of crack cocaine," and opined that "[i]t was near folly to even think that anyone would believe Gomez about anything, let alone the fact that she witnessed the same guy kill two different people."

311.    Yet after obtaining Hill's conviction based upon Gomez's testimony, this prosecutor and Scarcella celebrated together by smoking Scarcella's expensive cigars.

312.    Scarcella was open about his attitude, saying: "Are there rules when it comes to homicide? No. No, there are none. I lie to them. I will use deception. . . .  I don't play by the rules."

313.    Scarcella's partner Chmil produced a witness named Jeffrey Campbell in at least one murder prosecution and by his own admission "dealt with [Campbell] a few times."

314.    Like Gomez, Campbell was addicted to crack cocaine. According to Chmil, Campbell was "a lot like" Gomez, and "[s]ometimes [Campbell would] tell you the truth, sometimes he wouldn't."

315.    In 1994, Campbell said in a sworn statement that Chmil had given him a script on which to base his testimony in the 1987 murder trial of Valance Cole.

316.    Campbell admitted giving false testimony because, after Chmil introduced him to prosecutors, the latter promised to drop pending criminal charges against him if he testified.

317.    In December 1995, two months before Plaintiff Ruffin's arrest, Vincent Ellerbe, James Irons, and Thomas Malik were arrested for a high-profile, brutal homicide that occurred at a subway station less than a block away from the scene of the homicide Plaintiff was later accused of.

318.    Ellerbe, Irons, and Malik gave confessions.

319.    Scarcella and Chmil obtained Malik's and Irons' confessions.

320.    In November 1996, at the murder trial of Thomas Malik (the same month as
Plaintiff's), defense counsel alleged that Scarcella banged Malik's head against a locker
to coerce his confession.

321.    During Malik's prosecution, his attorney told the court: "This is a pattern in
some of [Scarcella's] cases. Eyewitnesses are shown photo arrays by Detective Scarcella
and sort of wonderously pick out the person who happens to be the top suspect at the
time."

322.    In 2022, the CRU agreed to vacate the convictions of Ellerbe, Malik, and
Irons.

323.    The CRU concluded that all three defendants' confessions were unreliable.

324.    At his February 1997 murder trial, Romel Ferrer testified that he had not
made any of the three oral and written inculpatory statements that Scarcella claimed he
had.

325.    At his March 1997 murder trial, Sundhe Moses testified that he had
confessed to a shooting, in September 1995, only after Scarcella struck him in the face
and choked him while pressing his head against a wall.

326.    Moses's conviction was later vacated by a Brooklyn Supreme Court justice.

327.    At her February 1998 trial, Vanessa Gathers testified that Scarcella and
Chmil had intimidated her, threatened her, and fed her the details that she included in her
false confession.

328.    The CRU, believing Gathers, later voluntarily vacated her conviction.

329.    CRU chief Mark Hale noted that "[t]he most striking thing about the confession of Ms. Gathers was that it was not a narrative confession, rather it was an acquiescence to various scenarios that were put to her" by Scarcella.

330.    Roger Logan was convicted in 1997 based upon eyewitness testimony developed by Scarcella which could not have been true because the eyewitness was in jail at the time—a fact that was withheld from the defense. Many years later, the CRU vacated this conviction.

331.    In 1988, Louis Holmes (a.k.a. Shabaka Shakur) was convicted of murder based upon a "confession" that Scarcella had fabricated.

332.    In 2015, a court overturned Shakur's conviction after finding that such fabrication had occurred.

333.    Rosean Hargrove and John Bunn were convicted of murder in 1992 in a case developed by Scarcella and Chmil.

334.    Their convictions were vacated in 2015 and 2018, respectively, based upon evidence that Scarcella and Chmil had arrested Hargrove without probable cause, that Scarcella and Chmil had employed questionable procedures when preparing a photo array, and that Scarcella and Chmil had conspicuously failed to document the photo-array procedure in DD-5s.

335.    Upon vacating Hargrove's conviction, the lower court summarized Scarcella's pattern of misconduct:

> The findings of this court are that *the assigned Detective, Louis Scarcella, was at the time of the investigation [in 1991] engaged in false and misleading practices*. The cases of David Ranta, Derrick

Hamilton, Robert Hill, Alvena Jennette and Darryl Austin that were investigated by Scarcella and prosecuted contemporaneously with this case in the early nineties demonstrate this *pattern and practice*. [This decision was issued before several more cases involving Scarcella were overturned.] The *pattern and practice of Scarcella's conduct which manifest a disregard for rules, law and the truth* undermines our judicial system and gives cause for a new review of the evidence.

*People v. Hargrove*, 49 Misc.3d 1208(A), at *8 (N.Y. Sup. Ct. Kings Cty. 2015) (emphases added).

336.    Based on the above pervasive misconduct by Scarcella and Chmil, the NYPD and the D.A.'s Office knew or should have known that Scarcella and Chmil were coercing confessions, manufacturing false or unreliable identification evidence, intentionally securing testimony that they knew to be false, giving false testimony themselves, and suppressing evidence favorable to criminal defendants which they knew they were obligated to disclose.

337.    Yet these agencies failed to take any adequate steps to supervise or discipline them to ensure that such misconduct did not occur.

338.    Indeed, the D.A.'s Office repeatedly used evidence these detectives had developed that they knew or should have known was false or unreliable and obtained convictions of criminal defendants whom they knew or should have known were likely to be innocent.

339.    Yet NYPD policymaking officials failed to supervise or discipline Scarcella or Chmil, and the KCDA continued to use the evidence these detectives manufactured.

340.     Scarcella and Chmil were celebrated as heroes for obtaining arrests and convictions at a blistering rate, thus sending a clear message to the entire NYPD police force that such misconduct would be not just tolerated but celebrated.

341.     Another of the many homicide detectives who engaged in repeated misconduct to which NYPD policymakers were deliberately indifferent was Michael Race.

342.     Michael Race was Defendant David Carbone's sergeant when he first began handling homicide cases as a detective, and trained him in his new role.

343.     Race admitted that he investigated 750 murder cases, through the late 1980s and early 1990s, but only one was "done the correct way, from A to Z."

344.     An NYPD colleague testified that Race

> had a reputation among detectives for feeding informants and witnesses details about crimes [and] that Race had a reputation of referring informants and witnesses to the TIPS hotline so they could collect rewards for information, which is a violation of police procedure because of the risk of kickbacks.

*Blake v. Race*, 487 F. Supp. 2d 187, 204 (E.D.N.Y. 2007).

345.     In 1990, Race caused both Jeffrey Blake and Ruben Ortega to be arrested and convicted on the word of a single informant produced by Race, Dana Garner.

346.     Defendant Carbone conducted a lineup in which Garner was instructed to pick Jeffrey Blake.

347.     Carbone was present while Garner told Race he didn't witness the shooting that Ruben Ortega would be convicted of, Race threatened him that Race's precinct's

officers would go after him unless he implicated Ortega, and Race then fed him the details of the shooting.

348.    Race fed Garner the details that Garner provided in testimony against Blake and Ortega.

349.    At trial, Garner tried to recant his story, but after prosecutors threatened him, he retook the stand and testified against Blake.

350.    A cousin of Garner's testified that Garner had not been in New York at the time of the double murder.

351.    In 1998, the KCDA conceded that Garner was an unreliable witness and consented to vacating Blake's conviction.

352.    In 1999, Garner signed a sworn statement recanting his accusations against Ortega and against another man, Timothy Crosby, whom Garner had previously accused of kidnapping him, resulting in Crosby's conviction and sentence of 10 years to life.

353.    That same year, a state judge vacated Crosby's conviction after finding Garner to be "a completely unreliable witness."

354.    In 2003, the Second Circuit vacated Ortega's conviction based on the unreliability of Garner's testimony.

355.    Despite Race's pattern of unlawful activity and reputation for manufacturing false evidence, NYPD policymaking officials did not investigate, discipline, or supervise him to prevent additional misconduct.

356.    Another case that illustrates the pattern of misconduct to which NYPD policymaking officials were deliberately indifferent is that of Zaher Zahrey.

357.    From 1994 to 1996 (the year Plaintiff was arrested and prosecuted), various senior detectives from the NYPD's Internal Affairs Bureau ("IAB"), including supervisors, tried to frame Zahrey, a decorated NYPD undercover narcotics detective whom they wrongly suspected of being corrupt, for drug-related crimes including murder.

358.    The initially assigned detective, then-Sergeant Robert Boyce, tape-recorded himself encouraging a state prisoner whom he knew to be a serial robber and murderer and to be addicted to crack, Sidney Quick, to adopt a false story Boyce suggested to him implicating Zahrey in a series of murders, robberies, and drug deals.

359.    Boyce knew the story was false because it contradicted Quick's prior statements as well as independent police investigation.

360.    Boyce improperly promised Quick a "very, very, very sweet deal" and to "drive [Quick] home" if, contrary to his prior statements, he'd "nail Zack to a cross" by accusing Zahrey of being present for and participating in these crimes.

361.    Later, when other IAB detectives could not corroborate Quick's manufactured claims, they convinced the United States Attorney's Office in Brooklyn to take over the case by concealing Boyce's tape of Quick.

362.    While Quick was refusing to cooperate with the federal authorities, another assigned IAB detective, Kelly Wirth, worked with a prosecutor from the KCDA, Teresa Corrigan, to use secret coercion and under-the-table promises to induce Quick into agreeing to testify.

363.    Zahrey ultimately was acquitted, but not until he had spent nearly nine months in jail on the manufactured charges.

364.    Zahrey also was acquitted by an NYPD administrative judge who found in a written decision that Boyce had led Quick to manufacture false allegations.

365.    The New York City Police Commissioner formally ratified this finding.

366.    Nevertheless, the NYPD continually promoted Boyce until he received the ultimate reward: appointment as Chief of Detectives for the entire department.

367.    None of the other IAB personnel involved in the Zahrey case were disciplined; instead, most were promoted.

368.    NYPD detectives also committed misconduct to obtain a corrupt murder conviction in 1995 in the Jabbar Collins case.

369.    Brooklyn detectives suspected Collins of having committed the botched robbery-murder of an Orthodox rabbi-landlord in 1994 in Williamsburg.

370.    The assigned detective, Vincent Gerecitano, a veteran homicide investigator, refused to accept the denial of a heroin addict, Edwin Oliva, who had just been arrested for an unrelated robbery committed in the same building, that he knew anything about the murder in question.

371.    Gerecitano detained Oliva for many hours and interrogated him while he was going through withdrawal and was drooling, crying, exhausted, and desperate.

372.    Gerecitano coerced Oliva into signing a sworn written statement implicating Collins by refusing to summon medical assistance for Oliva while

simultaneously promising him that he would assist Oliva in obtaining leniency from the Brooklyn D.A.'s Office.

373.    Gerecitano omitted all these circumstances from his written report and never disclosed them to prosecutors.

374.    Later, before trial, Oliva recanted his coerced written statement, but prosecutors, evidently unaware of how Gerecitano had coerced Oliva's original sworn written statement, brought in Gerecitano to pressure Oliva to recant his recantation.

375.    Ultimately, in 2010, after Collins had spent 16 years in prison, prosecutors revealed the recantation, a federal judge ordered Collins's release, and all charges were dismissed.

376.    NYPD detectives also used improperly suggestive identification procedures, as they did in some of the cases discussed previously in this Complaint and as they did in this case, to manufacture false or unreliable identification evidence in numerous homicide and other serious felony cases.

377.    After the arrest of Kareem Bellamy in 1994 for a stabbing death, NYPD Detective John Gillen conducted a lineup that included Bellamy.

378.    The only known eyewitness could not positively identify Bellamy.

379.    The detective took the witness into a private room for an improper private meeting, after which the witness suddenly claimed to be certain that Bellamy was the perpetrator.

380.    The witness's identification of Bellamy was a significant cause of Bellamy's conviction at trial.

381.    Bellamy was imprisoned for 14 years before his conviction was overturned and the charges against him dismissed.

382.    In 1996, the same Detective Gillen conducted a lineup in the investigation of Emmett Wheaton for a robbery.

383.    At the lineup, Wheaton heard Gillen saying to the witness, "Is it number four? Is it number four? Is it number four?"

384.    The witness picked out number four, Wheaton, and Wheaton was arrested and charged.

385.    Wheaton was acquitted at trial, but only after spending almost a year in jail.

386.    In 1999, NYPD detectives brought Jason Chambers, who had witnessed a murder, to view a lineup containing suspect Pierre Jenkins.

387.    Chambers picked Jenkins.

388.    The next year at a pretrial hearing, Chambers testified that he had picked Jenkins only after the detectives had told him: "you got to pick somebody. It was like, you got to get him. Pick somebody."

389.    Chambers then recanted his identification of Jenkins.

390.    Asked why he had picked Jenkins originally, Chambers said: "Because the detectives were, like, you had to pick somebody. I just wanted to go home and they were just, like, forcing me to pick somebody."

391.    After Chambers's recantation, prosecutors dropped the murder charges against Jenkins.

392.    In 1999, NYPD detectives investigating a deadly shooting conducted a lineup containing suspect Ronald Ambrose.

393.    Witness Edgar Rivera had, within an hour of the shooting, identified another man as the perpetrator.

394.    Rivera viewed the lineup containing Ambrose and did not identify Ambrose.

395.    Detective Jose Rosario then took Rivera into an office at the police precinct.

396.    Approximately 20 minutes later, Rosario and Rivera returned, and Rivera identified Ambrose as one of the shooters.

397.    After this identification, Ambrose was indicted for murder.

398.    Based on independent exculpatory evidence, Ambrose was acquitted at trial, but only after having served over two years in pretrial detention.

399.    In 1994, NYPD detectives investigating a murder in Queens put Jaythan Kendrick in a lineup and showed the lineup to 10-year-old witness Brandon Rogers.

400.    Rogers selected a filler, number six.

401.    Detectives had Rogers review and sign a Line-Up Report that identified number three, Kendrick, as the police "Subject."

402.    Detectives then took Rogers and Rogers's mother into a private room, where Rogers heard a detective say that Rogers had selected the wrong person.

403.    Rogers, having learned that number three, Kendrick, was the police suspect, now told the detectives that number three was his "second choice."

404.    Rogers testified to this manufactured identification of Kendrick at trial, and Kendrick was convicted and spent almost 25 years in prison before forensic evidence that exculpated Kendrick came to light and his conviction was vacated and the indictment dismissed.

405.    In 2005, Detective Robert Moscoso presented a lineup containing Julio Negron to an eyewitness to a Queens shooting.

406.    The eyewitness made an equivocal statement about whether he recognized Negron as the shooter.

407.    Moscoso then manufactured the witness's positive identification of Negron by showing the witness a Line-Up Report that identified Negron, in capital letters, as the police "SUSPECT," and taking the witness into a private room and speaking to him for at least 15 minutes.

408.    Negron spent nearly 10 years in prison before the New York Court of Appeals reversed his conviction.

409.    In 2009, Ricardo Benitez, a parolee, was arrested on suspicion of robbing a Radio Shack store in Queens.

410.    NYPD officers Raul Lopez and Frank Libretto deliberately prepared a highly suggestive lineup to ensure that Benitez was identified: Benitez appeared to be 15 to 20 years older than the fillers in the lineup, had much darker skin, was noticeably thinner, and was sickly looking, unshaven, and disheveled, whereas the fillers all were hale and clean-cut police officers.

411.    A Queens ADA, Tina Grillo, who was present to supervise the lineup, told Detectives Lopez and Libretto that the lineup was improperly suggestive but then acquiesced in the procedure when they refused to select new fillers.

412.    Based on the resulting identification, a grand jury, which was not informed of the suggestiveness of the lineup, indicted Benitez.

413.    Benitez was convicted and spent almost six years in prison before his conviction was reversed and he was acquitted on retrial.

414.    Until 2010, the NYPD had no policy, practice, or procedure to learn about and investigate allegations in lawsuits, settlements in lawsuits, or judicial findings of improper or illegal behavior by police officers, concerning investigations, arrests, and prosecutions.

415.    This was even though, since 1992, the NYPD had been admonished by two different New York City Comptrollers, as well as the Bar Association of the City of New York, to impose discipline on officers involved in settled civil cases in which constitutional violations were alleged, and to institute new training in response to such claims, and/or other remedial action.

416.    In a 1992 report, then-Comptroller Elizabeth Holtzman recommended that the NYPD "monitor claims and lawsuits involving charges of police misconduct in addition to complaints filed with the Civilian Complaint Review Board and correlate the data from all three sources," and to "use the data from claims and lawsuits, as well as civilian complaints, to identify and correct problems in training or other procedures and policies; and identify individual police officers and take appropriate follow-up action,

including additional training or other assistance" in order to "improve the functioning of the NYPD."

417.    In a 1999 report, then-Comptroller Alan Hevesi recommended that the City "[r]eview settled claims data," and re-train and discipline officers accordingly.

418.    In a 2000 report, The Association of the Bar of the City of New York concluded that the City's "policy" of failing to re-train or discipline officers involved in settled civil rights lawsuits "has resulted in a situation in which the City consistently misses opportunities to increase the protection of the rights of persons in the City."

419.    The NYPD took no official action in response to any of these reports and recommendations.

420.    In a report issued in 2010, then-Comptroller John Liu reported that, for the first time, the City paid out more money in the 2009-10 fiscal year for lawsuits against the NYPD than against any other City agency. He again recommended that the NYPD monitor incidents and practices that would give rise to claims.

421.    The NYPD failed to act despite its being put on notice, in the 1990's and early 2000's, to officers' misconduct by numerous civil lawsuits credibly alleging officers' violations of individuals' constitutional rights.

422.    In the following civil rights lawsuits, the City paid substantial monetary settlements to plaintiffs for their claims that NYPD officers manufactured evidence, gave false testimony or statements, initiated prosecutions without probable cause, or otherwise violated the constitutional rights of the accused:

a.  *Almonte v. City of New York, et al.*, 99-cv-519 (E.D.N.Y.) (settled 7/12/00, $30,000): plaintiff arrested on drug sale charges without probable cause; indictment dismissed by the court one year, eight months after arrest.

b.  *Boland v. City of New York, et al.*, 93-cv-5058 (E.D.N.Y.) (settled 8/6/96, $30,000): plaintiff arrested without probable cause; held in custody for two nights.

c.  *Bradley v. City of New York, et al.*, 97-cv-4076 (E.D.N.Y.) (settled 10/14/98, $20,000): plaintiff ordered to pull car over without probable cause; falsely arrested based on outstanding Illinois warrant issued for a different person; and held in custody for three days despite evidence that she was not the person being sought by the warrant.

d.  *Carthens v. City of New York, et al.*, 94-cv-8764 (S.D.N.Y.) (settled 3/18/97, $200,000): plaintiff arrested without probable cause; police fabricated that plaintiff had dropped a bag that contained cocaine and a weapon; police swore to a Criminal Court complaint with false allegations.

e.  *Castro v. City of New York, et al.*, 94-cv-5114 (S.D.N.Y.) (settled 1/14/97, $72,500): plaintiff arrested on weapons possession charges without probable cause; charges dropped after plaintiff was held in custody for several hours. Complaint alleged that NYPD officer responded to plaintiff's complaints about wrongful arrest by saying that he would not release her, but if the arrest were in error she could "always sue the City, [because] they got a lot of money."

f.  *Coleman, et al. v. City of New York, et al.*, 00-cv-2019 (E.D.N.Y.) (settled 1/2/01, $60,000): two plaintiffs arrested without probable cause; charges pending for 2 ½ months before dismissal. Complaint alleged that NYPD had policy, custom, and/or practice of arresting individuals without probable cause in lower income areas and areas with high reports of crime, which resulted in plaintiffs' false arrest and malicious prosecution.

g.  *Cotto v. City of New York, et al.*, 00-cv-1341 (E.D.N.Y.) (settled 12/01/00, $30,000): plaintiff arrested without probable cause; charges pending for one month before dismissal by the court.

h.  *Crespo v. City of New York, et al.*, 93-cv-8847 (S.D.N.Y.) (settled 8/29/06, $25,000): plaintiff arrested without probable cause on weapons possession charges. Complaint alleged *Monell* claim based on the NYPD's "fostering [of] a policy to which perjury and the falsification of documents were methods of securing indictments and convictions of innocent individuals."

i.   *Dabbah v. City of New York, et al.*, 95-cv-2952 (S.D.N.Y.) (settled 3/12/96, $35,000): plaintiff arrested without probable cause; charges dismissed on People's motion eight months after arrest.

j.   *Daniels v. City of New York, et al.*, 00-cv-1981 (S.D.N.Y.) (settled 3/15/00, $28,500): plaintiff arrested without probable cause on weapons charges; charges dismissed by the court eight months after arrest.

k.   *Davis v. City of New York, et al.*, 00-cv-387 (S.D.N.Y.) (settled 1/19/00, $175,000): plaintiff arrested without probable cause; spent four months in jail before jury acquittal; during criminal trial, trial court found that plaintiff's arrest was "illegal and outrageous," that he was arrested solely because of his race, and that police took plaintiff's photo and showed it to the complainant unlawfully and without probable cause.

l.   *Deluise v. City of New York, et al.*, 98-cv-4535 (S.D.N.Y.) (settled 3/18/99, $28,000): plaintiff arrested without probable cause.

m.   *Denizard v. City of New York, et al.*, 98-cv-423 (E.D.N.Y.) (settled 6/4/99, $64,000): plaintiff arrested without probable cause for disorderly conduct, resisting arrest. Charges dismissed on People's motion eight months after arrest.

n.   *Dennis v. City of New York, et al.*, 98-cv-5355 (E.D.N.Y.) (settled 5/26/99, $15,000): plaintiff threatened, assaulted, and arrested without probable cause; false charges filed against plaintiff.

o.   *Espinal v. City of New York, et al.*, 95-cv-9759 (S.D.N.Y.) (settled 6/7/96, $800,000): plaintiff arrested without probable cause; police falsely testified before the grand jury; after plaintiff's guilty plea, conviction was vacated and the indictment was dismissed as procured by false and/or perjured testimony.

p.   *Fields v. City of New York, et al.*, 99-cv-8130 (E.D.N.Y.) (settled 7/28/00, $15,000): plaintiff arrested without probable cause; prosecution continued for four months before dismissal by court.

q.   *Frantino v. City of New York, et al.*, 96-cv-3725 (S.D.N.Y.) (settled 4/15/97, $50,000): two plaintiffs arrested without probable cause and issued Desk Appearance Tickets; district attorney declined prosecution; parking summons issued by police dismissed for facial insufficiency.

r.  *Gager v. City of New York, et al.*, 97-cv-4718 (S.D.N.Y.) (settled 6/1/98, $105,000): plaintiff issued false summonses for criminal trespass and disorderly conduct; charges dismissed on People's motion.

s.  *Gallion v. City of New York, et al.*, 93-cv-5180 (S.D.N.Y.) (settled 7/18/94, $25,000): plaintiff arrested without probable cause; charges were dismissed.

t.  *Gallo v. City of New York, et al.*, 95-cv-2105 (E.D.N.Y.) (settled 7/5/94, $13,334): plaintiff arrested for robbery without probable cause; charges subsequently dismissed.

u.  *Gaylock, et al. v. City of New York, et al.*, 96-cv-6183 (E.D.N.Y.) (settled 3/6/98, $90,000): plaintiffs arrested without probable cause on weapons charges, which were pending for 10 months before dismissal by court.

v.  *Golston v. City of New York, et al.*, 98-cv-4206 (E.D.N.Y.) (settled 10/26/00, $25,000): plaintiff arrested on false charges of criminal harassment, which were dismissed after four months.

w.  *Gordon v. City of New York, et al.*, 97-cv-8035 (S.D.N.Y.) (settled 11/12/98, $40,000): plaintiff arrested without probable cause based on false allegations in felony complaint made by NYPD officers; charges dismissed by prosecutor three months after arrest.

x.  *Gurley v. City of New York, et al.*, 95-cv-2422 (E.D.N.Y.) (settled 8/21/97, $1,750,000): conviction obtained in 1972 was vacated more than 20 years later based on prosecutor's withholding of exculpatory evidence, including an NYPD ballistics report. Complaint contained a malicious prosecution claim.

y.  *Howlen v. City of New York, et al.*, 97-cv-6544 (S.D.N.Y.) (settled 12/22/97, $200,000): plaintiff arrested without probable cause; police swore to false complaint; police testified falsely during preliminary hearing and in the grand jury; police admitted to committing perjury in connection with plaintiff's case.

z.  *Jefferson v. City of New York, et al.*, 98-cv-1097 (E.D.N.Y.) (settled 4/14/99, $175,000): plaintiff, a corrections officer, arrested on drug charges without probable cause; charges pending for 5 months before grand jury returned no true bill. Complaint alleged that NYPD officers failed to inform prosecutors of their knowledge of plaintiff's innocence during the prosecution.

aa.  *Kadlub v. City of New York, et al.*, 95-cv-1080 (E.D.N.Y.) (settled 12/11/96, $34,000): plaintiff arrested without probable cause on drug possession and sale charges.

bb.  *Lindo v. City of New York, et al.*, 98-cv-9066 (S.D.N.Y.) (settled 11/21/00, $85,000): plaintiff arrested without probable cause; police swore to false felony complaint; district attorney agreed to dismissal of charges.

cc.  *Lopez, et al., v. City of New York, et al.*, 93-cv-6516 (S.D.N.Y.) (settled 1/2/96, $80,000): two plaintiffs were arrested without probable cause and unlawfully strip searched; district attorney declined to prosecute.

dd.  *Lovell v. City of New York, et al.*, 00-cv-0002 (S.D.N.Y.) (settled 10/20/00, $40,000): plaintiff arrested without probable cause for turnstile jumping based on false statements made by NYPD officer in criminal complaint.

ee.  *Mahase v. City of New York, et al.*, 96-cv-6105 (E.D.N.Y.) (settled 6/16/00, $75,000): plaintiff arrested and detained without probable cause; charges dismissed on district attorney's motion due to lack of probable cause.

ff.  *Marino v. City of New York, et al.*, 97-cv-9003 (S.D.N.Y.) (settled 6/4/98, $90,000): plaintiff arrested and strip-searched without probable cause; released when district attorney declined to prosecute case.

gg.  *Martinez v. City of New York, et al.*, 96-cv-289 (E.D.N.Y.) (settled 4/12/99, $50,000): plaintiff assaulted and arrested without probable cause when police entered her apartment with a battering ram looking for her son.

hh.  *McCaskill v. City of New York, et al.*, 96-cv-3687 (E.D.N.Y.) (settled 7/10/97, $100,000): plaintiff arrested for disorderly conduct without probable cause.

ii.  *Nakajima, et al. v. City of New York, et al.*, 94-cv-857 (E.D.N.Y.) (settled 3/8/95, $51,000): two plaintiffs arrested without probable cause, while driving in rental car, despite providing a valid rental agreement.

jj.  *Napoli v. City of New York, et al.*, 97-cv-1255 (E.D.N.Y.) (settled 4/9/99, $60,000): plaintiff arrested and indicted on weapons possession and assault charges based on false testimony by NYPD officers in grand jury. Plaintiff acquitted approximately one year after arrest.

kk.  *Nieves v. City of New York, et al.*, 94-cv-1491 (E.D.N.Y.) (settled 4/25/96, $50,000): plaintiff, a security officer with the City's Department of

Business Services with a Special Patrolman's license, was arrested without probable cause in baseless drug sweep, but never arraigned. Due to the incident, Plaintiff's employer revoked his license. An officer concocted a false story preventing Plaintiff from defending himself at a hearing pertaining to the revocation of his license.

ll.    *Paster v. City of New York, et al.*, 95-cv-10316 (S.D.N.Y.) (settled 3/23/98, $115,000): plaintiff arrested without probable cause; charges against him were dismissed.

mm.    *Perez v. City of New York, et al.*, 98-cv-2331 (S.D.NY.) (settled 1/16/99, $15,000): plaintiff arrested without probable cause; charges dismissed by court approximately one month after arrest.

nn.    *Rojas v. City of New York, et al.*, 96-cv-8728 (S.D.N.Y.) (settled 3/31/97, $800,000): plaintiff arrested without probable cause; police falsely charged plaintiff and testified falsely in the grand jury; plaintiff's conviction was vacated and indictment dismissed.

oo.    *Sharp v. City of New York, et al.*, 97-cv-4236 (S.D.N.Y.) (settled 3/17/98, $55,000): plaintiff arrested and strip-searched without probable cause; falsely charged; charges were subsequently dismissed.

pp.    *Sierzputowski, et al. v. City of New York, et al.* (E.D.N.Y.) (settled 12/1/97, $55,000): two plaintiffs arrested without probable cause while driving a rental car, despite producing proof of valid rental; plaintiffs in custody for 41 hours until arrests voided.

qq.    *Silver v. City of New York et al.*, 97-cv-5384 (E.D.N.Y.) (settled 3/2/99, $40,000): plaintiff arrested without probable cause; charges were dropped approximately four months later.

rr.    *Sweazie v. City of New York, et al.*, 99-cv-419 (E.D.N.Y.) (settled 10/20/99, $20,000): plaintiff arrested on weapons possession charges; prosecution continued based on NYPD officers' false statements in felony complaint. Charges dismissed when grand jury voted no true bill.

ss.    *Taousse v. City of New York, et al.*, 95-cv-7965 (S.D.N.Y.) (settled 12/4/96, $16,000): plaintiff arrested without probable cause and falsely charged with violating traffic laws; charges were dismissed.

tt.     *Tomback v. City of New York, et al.*, 96-cv-3972 (E.D.N.Y.) (settled 2/9/98, $20,000): plaintiff arrested without probable cause; charges dismissed due to lack of evidence.

uu.     *Tong v. City of New York, et al.*, 95-cv-7965 (S.D.N.Y.) (settled 10/4/95, $35,000): plaintiff arrested and strip searched for traffic violation, which was later dismissed.

vv.     *Udofia v. City of New York, et al.*, 00-cv-4872 (E.D.N.Y.) (settled 1/4/01, $30,000): plaintiff arrested and detained without probable cause; was not prosecuted.

ww.     *Victor v. City of New York, et al.*, 96-cv-243 (S.D.N.Y.) (settled 6/17/96, $725,000): plaintiff arrested without probable cause; police falsely charged plaintiff and committed perjury in the grand jury; plaintiff's conviction was vacated and indictment dismissed.

xx.     *Williams v. City of New York, et al.*, 98-cv-5917 (S.D.N.Y.) (settled 2/1/99, $300,000): plaintiff arrested without probable cause for possessing controlled substance; police falsified evidence to effect unlawful arrest of plaintiff.

yy.     *Ziehenni v. City of New York, et al.*, 98-cv-3763 (S.D.N.Y.) (settled 3/5/99, $55,000): plaintiff arrested without probable cause; charges pending for 2 ½ months before they were dismissed by the court. Complaint alleged arrest was made in retaliation for plaintiff's prior CCRB complaint.

423.    The NYPD did not discipline any of the officers involved for their conduct, despite paying out the above settlements.

424.    The aforementioned policies, customs, and/or practices of the NYPD and/or KCDA regarding, and policymakers' deliberate indifference to, coercion of false statements, fabrications of evidence including manufacturing eyewitness identifications through suggestion, and initiation of arrests and prosecutions without probable cause, directly, foreseeably, proximately, and substantially caused the violations of Mr. Ruffin's federal constitutional rights in this case and his resulting injuries.

425.    By virtue of the foregoing, under 42 U.S.C. § 1983, Defendant City of New York is liable for the misconduct of NYPD officers which caused Mr. Ruffin's wrongful prosecution and conviction and all his consequential damages, including but not limited to his wrongful prosecution, conviction, and subsequent imprisonment and parole restrictions.

## SEVENTH CAUSE OF ACTION
**_Monell_ Liability Under 42 U.S.C. § 1983 Based on the Violation by KCDA Prosecutors of Plaintiff's Right to Due Process and a Fair Trial Under the Fourth, Fifth, Sixth, and Fourteenth Amendments.**
**Defendant City of New York.**

426.    Plaintiff repeats and realleges each allegation contained in the preceding paragraphs as if fully set forth herein.

427.    In September and October 1996, a suppression hearing was held concerning the admissibility of Clayton's out-of-court identifications of Ruffin and the inculpatory statements made by Ruffin.

428.    ADA Caryn Stepner represented the prosecution at the hearing.

429.    ADA Stepner presented testimony by Scarcella.

430.    Scarcella falsely claimed that during his interrogation of Plaintiff, he called Nevet on the phone, and was told she wasn't with Plaintiff at the time of the shooting.

431.    Scarcella further claimed that Plaintiff Ruffin's confession was voluntary.

432.    Scarcella omitted any mention of the threats and promises that the police made to Plaintiff, and specifically denied that Defendant Ruffin had threatened his son.

433.    As a result of Scarcella's testimony, the court denied suppression of Plaintiff Ruffin's statements.

434.    As described in ¶¶ 223–340, *supra*, at the time of this pretrial hearing, the KCDA was aware of evidence that Scarcella habitually coerced or manufactured confessions and engaged in a slew of other corrupt practices.

435.    This evidence would have undermined Scarcella's credibility while showing his propensity to manufacture false confessions and identification evidence.

436.    ADA Stepner did not disclose any of this evidence to the defense despite her obligation to disclose favorable evidence to the defense under *Brady v. Maryland*, 373 U.S. 83 (1963).

437.    ADA Stepner also represented the prosecution at trial.

438.    Once again, Scarcella was called by the prosecution to testify concerning Plaintiff's interrogation.

439.    Scarcella again failed to testify to the threats and promises made to Ruffin.

440.    As noted in ¶ 137, *supra*, Scarcella was called as a rebuttal witness to testify, contrary to Nevet's testimony, that Nevet had denied being with Plaintiff at the time of the shooting.

441.    Not only did ADA Stepner again fail to disclose the considerable evidence possessed by the KCDA that would have destroyed Scarcella's credibility, she capitalized on it.

442.    Responding to an attack by the defense upon Scarcella's credibility, ADA Stepner rhetorically asked the jury, "Well, what evidence do you have before you that he's not [credible]? Think about it."

443.    Of course, the jury lacked any such evidence precisely because prosecutors had failed to disclose it.

444.    Stepner's misconduct in her closing argument was not limited to that remark.

445.    On summation, Stepner continually improperly denigrated defense witnesses as liars by claiming that Ruffin and his witnesses had conspired to falsely claim Glover was the shooter when it was too late to charge him.

446.    In fact, ADA Stepner knew of evidence that defendant's family had told law enforcement since early in the investigation that Glover was the shooter.

447.    Stepner also possessed an audio recording on which Glover had placed himself at the scene of the shooting, and knew that, despite this admission and the fact that Glover possessed the supposed murder weapon, the D.A.'s Office had failed to interview Glover.

448.    ADA Stepner also made various remarks improperly mocking the defense witnesses and implying they were liars.

449.    Stepner later improperly made the integrity of the NYPD an issue, saying of the detectives, "Why are they looking to frame this innocent man? Why are they trying to get him, of all the people in Brooklyn, to confess to this murder if he has nothing to do with it?"

450.    The court sustained an objection, but, undeterred, Stepner continued, "Why? Why pick him?"

451.    In addition to improperly converting Ruffin's defense that his statement was coerced into a seeming attack on the overall integrity of the police, Stepner's comments improperly suggested that the police possessed reason to focus on Plaintiff that was unknown to the jury.

452.    Individually and collectively, the KCDA's presentation of and failure to correct false or misleading evidence and argument at pretrial and trial proceedings, summation misconduct of other kinds, and failure to disclose *Brady* material, including but not limited to that discussed above, deprived Plaintiff of his constitutional rights to due process and a fair trial and to be free from unreasonable seizure and were a substantial cause of Plaintiff's constitutional injuries.

453.    These violations of Plaintiff's constitutional rights, among others, wholly or substantially resulted from the unlawful policies, customs, and practices of the KCDA, for which the District Attorney, as chief policymaker for the D.A.'s Office, was responsible.

454.    Under the principles of municipal liability for federal civil rights violations, the D.A. and/or his authorized delegates have final managerial responsibility for training, instructing, supervising, and disciplining attorneys and other employees of the D.A.'s Office with respect to the investigation and prosecution of criminal matters.

455.    The particular areas in which the D.A. and/or his authorized delegates were responsible for training, instructing, supervising, and disciplining attorneys and other employees of the D.A.'s Office included but were not limited to:

a.    their continuing constitutional obligation to timely and fully disclose material evidence and information favorable to the defense as set forth in *Brady*, *Giglio*, and their progeny;

b.    the constitutional prohibition on introducing, or knowingly failing to correct, false or misleading testimony by prosecution witnesses; and

c.    their constitutional obligation to give summations that comply with fundamental rules governing the conduct of a fair trial.

456.    The aforesaid deliberate or *de facto* policies, procedures, regulations, practices, and/or customs, including the failure to properly instruct, train, supervise, and/or discipline employees with regard thereto, were implemented or tolerated by policymaking officials for Defendant City, including, but not limited to, the D.A. and/or his delegates, who knew (or should have known):

a.    to a moral certainty that such policies, procedures, regulations, practices, and/or customs concerned issues that regularly arose in the investigation and prosecution of criminal cases;

b.    that such issues presented employees with difficult choices of the sort that instruction, training, supervision, and discipline would make less difficult;

c.    that employees facing such issues had strong incentives to make the wrong choices, especially given the pressure the D.A.'s Office placed on prosecutors to win convictions at any cost;

d.    that the wrong choice by municipal employees concerning such issues would frequently cause the deprivation of the constitutional rights of the accused and caused them constitutional injury; and

e.    that employees of the D.A.'s Office had a history of making wrong choices in such matters.

457.    The aforementioned policymaking officials had the knowledge and the notice alleged in the preceding paragraph based upon:

a.    numerous credible allegations, many substantiated by judicial decisions (as discussed further below), that KCDA prosecutors had:

i.    failed to disclose information favorable to the defense that was required to be disclosed by the constitutions and the laws of the United States and of the State of New York;

ii.    introduced, or knowingly failed to correct, testimony or other evidence that was false or misleading; and

iii.    made arguments at trial that were so false, misleading, or otherwise improper that they deprived the defendant of due process and a fair trial; and

b.    the inherent obviousness of the need to train, supervise, and/or discipline ADAs in the aforementioned constitutional obligations to counteract the pressure that the D.A.'s Office applied to prosecutors to obtain convictions.

458.    Charles J. Hynes was the Kings County District Attorney from 1990 to 2013.

459.    Hynes's managerial and personnel policies were aimed at encouraging prosecutors to win convictions at any cost, including by suppressing exculpatory evidence in violation of *Brady*, using false testimony, and committing summation misconduct.

460.    Hynes's training, policies, customs, and practices in response to allegations of prosecutorial misconduct communicated to his staff that so long as they won convictions, he would support them, regardless of the means they employed to secure those convictions.

461.    The existence of such training, policies, customs, and practices during Hynes's tenure as D.A. is established by, *inter alia*, the sworn admissions of former

KCDA prosecutors, KCDA internal records, and/or admissions by Hynes himself during his December 13, 2013, videotaped deposition in the Jabbar Collins case.

462.    Hynes and his top lieutenants—his counsel, Dino Amoroso; his Chief of investigations and former Chief of the Homicide Bureau, Michael Vecchione; his Chief Assistant, Amy Feinstein; and numerous other ADAs and supervisors—admitted in sworn depositions in *Collins v. City of New York*, No. 11 CV 766 (FB) (RML) (E.D.N.Y.); *Zahrey v. City of New Yo*rk, No. 98 Civ. 4546 (S.D.N.Y.); and other cases that Hynes had no written *Brady* policy, no formal rules of behavior governing how cases would be prosecuted and when (if ever) discipline for misconduct would be warranted, and no formal disciplinary system for investigating or disciplining prosecutors who violated the rights of criminal defendants.

463.    While Hynes maintained an employee manual governing relatively minor issues such as the use of office equipment and time sheets, and penalties for violating those policies, there were no written standards by which prosecutors' conduct during the course of criminal cases would be assessed for discipline, much less any possible penalty that could be imposed.

464.    The KCDA representatives above testified that the office's informal disciplinary "procedure" was for Hynes himself to review all criticisms or complaints about prosecutors.

465.    These representatives testified, under oath, that while dozens of court decisions documenting the misconduct of KCDA prosecutors were brought to Hynes's attention, Hynes failed to report the offenders to outside attorney disciplinary bodies.

466.    Exhibit A is a list of 78 cases during Hynes's tenure—a large number decided in or before 1996, when Plaintiff's trial occurred—in which courts found KCDA prosecutors to have committed errors or misconduct related to their *Brady* obligations, their use of or failure to correct false testimony, and/or summation advocacy.

467.    The KCDA representatives mentioned above testified that Hynes did not in a single one of these instances direct that any internal disciplinary investigation be conducted, let alone that any discipline be imposed.

468.    The KCDA personnel files of the prosecutors involved in the cases listed in Exhibit A reveal no documentary evidence of disciplinary action ever being taken against the prosecutors and no notations of their misconduct, and Hynes conceded during his deposition testimony in the Jabbar Collins case that he took no remedial action with respect to such misconduct.

469.    Indeed, Hynes did not once in his 24 years in office ever terminate, suspend, demote, transfer, or otherwise discipline any prosecutor for such misconduct.

470.    Instead, KCDA personnel records establish that Hynes and his managerial staff almost invariably gave good evaluations, recommendations, promotions, and pay raises to prosecutors they knew had been alleged or found to have engaged in such misconduct, recommended some of them for judgeships and others for awards, and otherwise ratified the misconduct by aggressively defending it even after it was exposed.

471.    When Hynes received letters from the public or public officials praising his prosecutors, Hynes personally wrote to the prosecutors informing them that he had received the complimentary report, and praised the prosecutors. In contrast, when

prosecutors' conduct in their handling of a criminal case was criticized, Hynes ignored it, never investigated it, and never confronted the prosecutor about the alleged behavior.

472.    Likewise, while Hynes's complimentary letters were included in the prosecutors' personnel files, no notation was made about any of the complaints or evidence of the prosecutors' wrongdoing.

473.    When a court explicitly found that a prosecutor committed misconduct, no record of the finding was kept in the prosecutor's personnel file or in a central file, making it virtually impossible to track repeat offenders or to take a prosecutor's behavior into account before promoting the prosecutor to bureaus where the consequences of such misconduct were at their highest.

474.    Many prosecutors whom courts found to have committed misconduct were placed in supervisory and training positions over new ADAs, essentially ensuring that improper practices would be repeated.

475.    While failing to implement any disciplinary infrastructure for prosecutorial misconduct, Hynes did keep win/loss statistics, making a prosecutor's conviction rate a key factor in his or her ability to advance their careers within the office.

476.    A number of cases handled by Hynes's office in the years preceding Plaintiff's arrest and prosecution illustrate Hynes's unlawful policies and practices in action.

477.    Shortly after Hynes assumed office in 1990, he defended the wrongful conviction secured by the administration of a prior District Attorney in the infamous Waldbaum's Supermarket Fire case in which six New York City firefighters died.

Prosecutors had convicted a man named Eric Jackson of a purported arson that killed the firefighters and convinced the court to sentence Jackson to 25 years to life.

478.    However, the trial court vacated the conviction on the basis of new evidence that the homicide prosecutor, Jon Besunder, had concealed *Brady* material from Jackson indicating that a fire expert had deemed the fire accidental, that the Fire Department likely fabricated the arson to ensure the firefighters' families received greater death benefits, and that there was evidence that undercut Jackson's confession.

479.    In June 1990, the Appellate Division affirmed the trial court's decision.

480.    Instead of disciplining Besunder for these extraordinary *Brady* violations, Hynes promoted Besunder to First Deputy Chief of the KCDA Homicide Bureau, just a month after the Appellate Division's affirmance.

481.    At a subsequent evidentiary hearing in the *Jackson* case, the trial court found that Besunder's testimony at the hearing was "evasive and disingenuous." *People v. Jackson*, 154 Misc.2d 718, 722 (Sup. Ct. Kings Cty. June 12, 1992).

482.    Yet, as Besunder later testified at a deposition in the *Jabbar Collins* case, neither Hynes nor anyone else from the KCDA ever questioned him about the *Jackson* case, or even brought up his conduct in the case, before or after promoting him.

483.    Instead, Besunder continued in his supervisory position and was later promoted to Executive District Attorney, training younger ADAs on the Riding Program and instructing them to, among other things, avoid creating a record of evidence that a defendant could use to challenge his case.

484.    In the 1993 *Ruddy Quezada* case, Quezada was convicted based on the testimony of star witness Sixto Salcedo. During trial, the prosecutor portrayed Salcedo as a voluntary witness with no reason to lie. Years later, however, Salcedo recanted his trial testimony, explaining that he had been arrested on a material witness warrant and held against his will at a hotel by the KCDA.

485.    A high-level appellate prosecutor scoffed at Quezada's claims, arguing they were untrue, there was absolutely no evidence to support them, and there was "no copy of a material witness order in the file."

486.    The trial prosecutor, who was by then a supervisor in the KCDA, denied any knowledge of the material witness warrant as well.

487.    Years later, when a federal habeas court ordered discovery, the KCDA produced the supposedly non-existent material witness warrant and hotel custody records confirming Salcedo's account.

488.    The material witness warrant had been obtained by the very trial prosecutor who had sworn under oath that he had no knowledge of it.

489.    The case was remanded to state court, and Hynes took the position that the KCDA's suppression and misrepresentations regarding the material witness warrant and hotel custody did not constitute *Brady* violations or entitle Quezada to any relief.

490.    During discovery in state court, the KCDA turned over an email establishing that the appellate prosecutor who had claimed there was no material witness warrant in the file, like the trial prosecutor, had personal knowledge of the warrant long before she made her false representations.

491.    Yet Hynes neither investigated nor disciplined the trial or appellate prosecutors, or acknowledged that their conduct violated Quezada's right to due process.

492.    Instead, he continued to defend their conduct and the conviction secured through their suppression.

493.    It was not until Hynes's successor, Kenneth Thompson, came into office that the KCDA finally fired the appellate prosecutor and consented to vacatur and dismissal of all charges against Quezada.

494.    Hynes's acquiescence to such misconduct as a matter of policy is also demonstrated by his failure to sanction outrageous misconduct by then-Deputy Bureau Chief Mark Hale during the 1998 trial of Vladimir Campos, a potential death penalty case.

495.    During Hale's direct examination of a key witness, the witness blurted out that detectives had coerced him into making a statement incriminating Campos, and that prior to trial he had recanted his statement when meeting with Hale and subsequently failed a lie detector test.

496.    The defense objected that Hale had failed to disclose any of this information and moved for a mistrial.

497.    Hale responded by arguing, incorrectly, that the witness's pretrial recantation was not *Brady* material because it was not credible.

498.    When the Court asked Hale whether he "had any knowledge of the purported lie detector test," Hale falsely told the Court: "No, Judge. I don't recall. I don't

have anything in my file about that. The Court knows that I wasn't on this case right from the get-go. I'm not seeing anything in my files that purports to do that."

499.    But during a hearing on the *Brady* issue two days later, the D.A.'s Office revealed that, in truth, Hale himself had requested the lie detector test and had personally prepared the questions.

500.    It was also revealed that Hale had affirmatively misstated to the defense that the witness never recanted his story.

501.    The trial judge found that the pretrial recantation and polygraph test constituted *Brady* material, that Hale was "absolutely without justification" in failing to disclose it, and that Hale's false representations to the court were "prosecutorial misconduct."

502.    As a sanction, the judge struck the testimony of the witness in its entirety and gave the jury a curative instruction.

503.    Despite this explicit judicial finding of Hale's misconduct, neither Hynes nor anyone else in the KCDA investigated, sanctioned, disciplined, or penalized Hale.

504.    Instead, Hale maintained his supervisory position in the D.A.'s Office, and continued to receive promotions, including a promotion to Chief Counsel to Hynes.

505.    The court's finding of misconduct was not placed in Hale's personnel file, preventing any successor D.A. from learning of Hale's misconduct.

506.    As a result, when D.A. Thompson came into office, he promoted Hale to head a newly-constituted Conviction Review Unit.

507.    Perhaps the most egregious and revealing example of Hynes's policy and practice of defending prosecutors no matter how egregious and undeniable their misconduct is the case of Jabbar Collins.

508.    Collins was arrested in 1994 and prosecuted in 1995, the year before Plaintiff's arrest and prosecution.

509.    In 2006, Collins brought a post-conviction motion documenting, among other misconduct, *Brady* violations, witness coercion, and the knowing presentation of false evidence and argument by prosecutor Michael Vecchione, Hynes's longtime close confidante who was then chief of the KCDA's Homicide Bureau and later was Hynes's Chief of Investigations.

510.    Rather than investigate whether Collins's allegations were true, Hynes assigned several attorneys who were Vecchione's direct subordinates, and who were second-seating him on several high-profile cases, to defend Vecchione's conduct no matter how egregious they found it to be.

511.    These prosecutors presented in court a false sworn affirmation by Vecchione denying the allegations, which caused Collins's state-court post-conviction motion to be denied.

512.    However, proceedings in Collins's subsequent federal habeas corpus action forced the KCDA to disclose extensive *Brady* material that the KCDA had possessed all along but had withheld from Collins and his attorneys.

513.    The disclosure revealed that Vecchione's sworn affirmation, used to defeat Collins's state post-conviction motion, was perjured.

76

514.    Yet Hynes continued to support Vecchione, declared he had done nothing wrong, and held him out as exemplifying the qualities that served as an example to other prosecutors in the office.

515.    Ultimately, in granting Collins's habeas petition, dismissing the underlying state indictment, and releasing Collins from custody after 16 years of wrongful imprisonment, Judge Irizarry condemned Hynes and the KCDA for defending Vecchione's misconduct and for Hynes's failure to properly train, supervise, and discipline his staff.

516.    In the face of those egregious constitutional violations, Hynes had his prosecutors declare on the record during the proceeding before Judge Irizarry dismissing the case that the D.A.'s Office "stands behind the conduct of" Vecchione and other prosecutors who had committed misconduct.

517.    Within a day of the dismissal, Hynes told the media that Vecchione was a "very principled lawyer" and "was not guilty of any misconduct," and that he would not conduct any investigation into Vecchione's conduct.

518.    Hynes summarily declared Vecchione would face no disciplinary action.

519.    Hynes thereafter promoted Vecchione and continued to praise him.

520.    In subsequent civil proceedings, a federal judge, the Honorable Frederic Block, excoriated Vecchione's conduct and Hynes's failure to investigate it.

521.    Yet even after Judge Block's condemnation, which was reported in virtually all major New York newspapers, Hynes later testified, he did not even read Collins's civil complaint or post-conviction papers to review Vecchione's conduct.

522.    Hynes's own unethical and criminal conduct while in office, including his direct participation in *Brady* violations, in full view of his executive staff, speaks to his propensity to tolerate such conduct by his employees.

523.    Hynes had his counsel, Dino Amoroso, falsely notarize his wife's signature on a real estate document when she wasn't in the office and Amoroso didn't witness her signature.

524.    Amoroso exercised authority over the conduct of ADAs, yet he knew Hynes tolerated the criminal fabrication of false documents.

525.    Since Hynes's departure from the D.A.'s Office, the D.A.'s Office has explicitly found that unlawful policies and practices implemented by Hynes led to numerous wrongful convictions.

526.    In 2020, the D.A.'s Office published a comprehensive report admitting that the use of false evidence and suppression of *Brady* material were institutional failures of the Hynes administration and had resulted in at least 25 wrongful convictions. *See Kings County District Attorney's Office, 426 Years: An Examination of 25 Wrongful Convictions in Brooklyn, New York*, July 9, 2020, p. 14 ("Taken together, the wrongful convictions discussed here all point to failures of the prosecution as an institution— whether through acts of individual prosecutors, collective decisions, or failure to train or guide prosecutors adequately"); p. 60 ("In many of the cases, prosecutors . . . failed to disclose important relevant evidence. And in a number of cases, prosecutors failed to adhere to expectations of candor and diligence, thereby denying the defendants a fair trial").

527.    At all relevant times, the D.A. and/or his authorized delegates had final authority with respect to the management of personnel employed by or assigned to the D.A.'s Office and the administration of that office.

528.    These officials collectively constituted a City policymaker for whose actions or omissions the City is liable.

529.    By virtue of the foregoing, Defendant City of New York is liable for the violation of Plaintiff's constitutional rights pursuant to 42 U.S.C. § 1983 and Plaintiff's resultant injuries.

## **DEMAND FOR DAMAGES**

530.    Mr. Ruffin's injuries and consequential damages include, but are not limited to:

a.    his wrongful prosecution and conviction;

b.    his loss of liberty for more than 14 years, as a result of his arrest, prosecution, and conviction in the underlying case;

c.    his over three years spent under parole supervision, with his liberty constrained by highly restrictive conditions;

d.    the loss of the services, society, companionship, and consortium of his family and friends;

e.    past mental and emotional harm;

f.    future mental and emotional suffering;

g.    physical injuries and illness and inadequate treatment therefor; and

h.    lost employment income in an amount to be calculated by an economist.

WHEREFORE, Plaintiff Steven Ruffin demands judgment against the Defendants as follows:

a.    damages for lost income in an amount to be determined;

b.    additional compensatory damages of not less than $42 million;

c.    punitive damages against the Individual Defendants of not less than $15 million;

d.    reasonable attorneys' fees, together with costs and disbursements, under 42 U.S.C. § 1988, N.Y.C. Admin. Code § 8–805, and the inherent powers of this Court;

e.    pre-judgment interest as allowed by law; and

f.    such other and further relief as this Court may deem just and proper.

Yours, etc.,

/s/ Joel B. Rudin
Joel B. Rudin
Partha Sharma
Law Offices of Joel B. Rudin, P.C.
Carnegie Hall Tower
152 West 57th Street, 8th Floor
New York, New York 10019
(212) 752-7600
jbrudin@rudinlaw.com

*Attorneys for Plaintiff*

Dated:    New York, New York
          April 16, 2025